UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sweeteners Plus, LLC (d/b/a ingredientsPLUS), | |
| Plaintiff, | Civ. Case No. _____ |
| -against- | |
| Mark Rudolph and Derrick Wolfe Trucking, LLC | **COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

Sweeteners Plus, LLC (d/b/a ingredientsPLUS) (hereinafter "Plaintiff," "ingredientsPLUS," or the "Company"), by and through its attorneys, Norton Rose Fulbright LLP, for its Complaint against Defendants Mark Rudolph and Derrick Wolfe Trucking, LLC, (hereinafter "Defendants" collectively, and "Rudolph" or "DWT" individually) alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.     ingredientsPLUS, a company that provides logistics, transport, and processing services in the sweetener industry, brings the instant action against Rudolph and DWT based on a deliberate and unlawful scheme to knowingly violate the laws safeguarding legitimate enterprise and fair competition by misappropriating the Company's confidential and proprietary information, including the Company's most valuable trade secrets (hereinafter, the "Unlawful Scheme").

2.     Defendants' sole objective in perpetrating the Unlawful Scheme is to cheat the system.  Rather than invest the time, capital, and expertise necessary to develop such assets independently (like ingredientsPLUS did), Defendants knowingly and intentionally set out to

circumvent that process by unlawfully procuring and using the Company's confidential and proprietary information as a blueprint for DWT's own rapid expansion.

3.      ingredientsPLUS has become a leader in the industry of processing, distribution, and delivery of sweetener products in the Northeast region by developing a suite of sophisticated procedures, systems, and proprietary machinery that give the Company its competitive edge.  This confidential, proprietary, and trade secret information was developed by the Company's leadership team whose deep involvement in the Company's daily operations made this labor a personal endeavor.

4.      Rudolph was one of the first ten employees hired by ingredientsPLUS.  He joined the team in 1984, and was the Company's Chief of Operations, until he was promoted in 2019 to the executive position of Vice President of Operations and Quality.   And, in early 2025, he accepted the position of Vice President of Capital Projects.

5.      For over 40 years, Rudolph worked side-by-side with the Company's most trusted personnel – helping to build the Company from the ground up on principles of trust, commitment, and shared purpose, yet he quietly positioned himself to betray the Company from within.

6.      In or about 2020, the Company hired Rudolph's friend Derrick Wolfe, the principal and founder of DWT, as a logistics manager.[1]   At the time, DWT was a small local trucking company that did trucking/hauling for various customers, including for some of ingredientsPLUS's own customers and, occasionally, directly for ingredientsPLUS.  Rudolph and Wolfe worked together at the Company until Wolfe resigned in or around September of 2021, to focus on DWT's operations.

---

[1] Defendants' social media accounts make clear that their alliance extends beyond collegiality.  Since 2021, DWT has been the primary corporate sponsor for Rudolph Motorsports, a professional drag racing team, with Rudolph's son, Tyler Rudolph, as the team's lead driver.  A true and correct copy of the February 3, 2025 Facebook Post detailing this aspect of Defendants' relationship is attached hereto as Exhibit A.

7.     Beginning as early as June of 2023, Rudolph (while working as an executive for ingredientsPLUS) surreptitiously worked with DWT to build DWT's business by stealing ingredientsPLUS's confidential and trade secret information, and even soliciting the Company's long-time vendor with intimate knowledge of certain Company systems and equipment, in an effort to scale up DWT's operations.

8.     In the months prior to Rudolph's resignation from the Company, on or about June 5, 2025, Rudolph's scheme to steal the Company's confidential information and trade secrets escalated, with Rudolph downloading and emailing such documents to his personal email account.

9.     Rudolph and Wolfe colluded to develop and execute a shared plan to:

   a)  Deliberately breach Rudolph's non-compete agreement with ingredientsPLUS by Rudolph becoming employed at and, upon information and belief, having a financial interest in DWT;

   b)  Maliciously misappropriate ingredientsPLUS's and its customers' confidential, proprietary, and trade secret information in flagrant violation of Rudolph's confidentiality agreement with the Company in order to replicate the Company's equipment, systems, protocols, and/or procedures at DWT; and

   c)  Willfully violate Rudolph's non-solicitation agreements with ingredientsPLUS by Rudolph and DWT working together to systematically poach the Company's employees and customers, utilizing both the Company's and its customers' misappropriated information to do so.

10.    Using the Company's confidential, proprietary, and trade secret information, Defendants are actively poaching the Company's trusted employees across multiple departments with years of specialized knowledge about the Company's inner workings.

11.     Defendants are also soliciting the Company's most valuable customers, using the Company's and its customers' confidential, proprietary, and trade secret information to replicate ingredientsPLUS's business model, enabling Defendants to offer some of the same services at a lower price point.  Since Defendants undertook their Unlawful Scheme, at least one of the Company's customers has informed ingredientsPLUS that it does not plan to use the Company's services in the coming year, and several more have been identified as high-risk for terminating their contracts.  Further, some of the Company's customers have engaged DWT in addition and/or instead of ingredientsPLUS, to provide services previously performed by the Company, thereby diverting portions of the Company's expected income.

12.     Defendants' willfully and malevolently orchestrated actions constitute clear violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, New York common law, and breaches of a number of provisions of the written Agreements between the Parties.

13.     In addition to monetary damages, ingredientsPLUS now seeks injunctive relief as to Defendants' Unlawful Scheme, including an injunction (a) to prevent further use, disclosure, or dissemination of ingredientsPLUS's trade secret, confidential, and/or proprietary information, and to compel the return or destruction of misappropriated materials; (b) to enforce Rudolph's confidentiality, non-solicitation, and non-compete obligations, and to restrain further violations; and (c) to prevent future interference with ingredientsPLUS's contractual and business relationships.

## THE PARTIES

14.     ingredientsPLUS is a limited liability company formed under the laws of the State of Delaware, and its sole member, SWP Intermediate, LLC, is wholly owned by Holdco ASR, Inc., a Florida corporation with its principal place of business in Florida.  ingredientsPLUS is therefore a citizen of the State of Florida.

15.     Rudolph is a natural person who, upon information and belief, is domiciled in the State of New York.  Rudolph's last known address is 4817 Huff Road Hemlock, NY 14466. Rudolph is therefore a citizen of New York.  He was formerly employed by ingredientsPLUS from 1984 to 2025.

16.     Upon information and belief, DWT is a limited liability company formed under the laws of New York.  Upon information and belief, DWT member(s) are citizens of the State of New York.  Wolfe is the owner of DWT, and was himself formerly employed by ingredientsPLUS from 2020 to 2021 as a logistics manager.  ingredientsPLUS has previously engaged DWT to provide contingency or as-needed trucking services for ingredientsPLUS.

## JURISDICTION AND VENUE

17.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the Defend Trade Secrets Act, 18 U.S.C. § 1831 (the "DTSA").

18.     Further, the Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) for all remaining claims as they arise out of the same common nucleus of operative facts as those pertaining to ingredientsPLUS's claims under 18 U.S.C. § 1831, *et seq*.

19.     In addition, the Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332; ingredientsPLUS is a citizen of Florida and Defendants are citizens of New York.

20.     Venue is proper in the Southern District under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred within the District. Both DWT and ingredientsPLUS serve clients in geographic zones falling under this District's jurisdiction.  As one recent example, in November of 2024, DWT was engaged to transport goods into Duchess County.  A true and correct copy of the DWT's Duchess County Invoice is attached

hereto as Exhibit B.  Upon information and believe, DWT also transports goods into or out of Yonkers, New York.

21.    In addition, upon information and belief, DWT has recently appeared as a defendant in an action pending before the Bronx County Supreme Court,[2] and has not challenged that venue's propriety.  As the Bronx Borough falls within this District's jurisdiction, DWT can have no basis for objecting to venue in the instant action.  A true and correct copy of DWT's Answer in the Bronx Matter is attached hereto as Exhibit C.

22.    Venue is also proper on the basis that Rudolph expressly consented to this forum. A valid and enforceable forum selection clause is contained in Rudolph's 2019 Employment Agreement, entered into on September 1, 2019 between Rudolph and ingredientsPLUS ("Rudolph's Agreement").  A true and correct copy of Rudolph's Agreement is attached hereto as Exhibit D.

23.    ingredientsPLUS will meet the threshold amount in controversy, as Defendants' actions have caused, and will continue to cause, significant, irreparable harm to ingredientsPLUS, including substantial monetary damages in excess of $75,000.

## FACTUAL ALLEGATIONS

### I.    ingredientsPLUS Is a Leader in the Sweetener Industry Throughout the Northeastern United States

24.    ingredientsPLUS,  which has operations in Lakeville, New York and Landisville, Pennsylvania, and corporate headquarters in Rochester, New York, serves customers across the Northeast Region of the United States, providing both (a) non-refining services involving the processing and packaging of food-grade liquid and dry sweetener products, such as white and brown sugars, liquid sucrose and corn syrup, and (b) distribution and delivery services, through

---

[2] *Edwin Jose Gomez Tineo v. Derrick Wolfe Trucking, LLC, Ronald Young*, Index No. 818291/2024E.

the Company's direct access to long-haul rail lines and the Company-owned fleet of trucks, to ensure timely delivery of said sweetener products to its customers in the Northeast.

25.    The Company's customers include, among others, restaurants, bakeries, and confectionaries, as well as specialty beverage, canning, dairy-processing, pharmaceutical, and alcohol processing businesses.

26.    For most of its customers, the Company provides "Just in Time" delivery services, which involves trucking and delivery of food-grade sweetener products to local customers within an approximate radius of 350 miles from the Company's facilities in Lakeville, New York and Landisville, Pennsylvania.

27.    To support these operations, ingredientsPLUS has expended significant capital and resources to develop strategic sourcing partnerships, expertise in procuring supply chains, and a transportation network that includes Company-owned rail, a fleet of trucks, and approximately 200 specialized transport assets dedicated to delivering bulk sweetener products and by-products.

28.    The Company employs a team of commercial drivers to transport its products. These employees are critical to the Company's distribution and delivery services.  As such, the Company has invested heavily in developing a system of compensation incentives to ensure both timely delivery and driver recruitment and retention.  Such investments included retaining a third-party to assist with the development of a customized compensation incentive program for the Company's commercial drivers.

29.    The Company's confidential and trade secret information gives the Company its competitive edge by enabling it to tailor its services to the complex needs of each customer, and to satisfy its regulatory and customer-specific food-safety mandates, while attracting, recruiting

and maintaining its team of commercial drivers and other valuable employees to ensure processing and timely delivery of product to the Company's customers.

30.    The Company is subject to a number of state and federal regulations as well as customer-specific mandates to ensure the safety of the food-grade products it processes and transports at each stage of handling.  The obligations imposed by ingredientsPLUS's most valuable customers exceed those imposed by the government.

31.    In order to attract and retain these lucrative customer relationships, the Company has developed a proprietary and efficient trailer wash system, referred to as a Clean-In-Place (CIP) system, to ensure that the cleanliness of its trailers which transport food products meet and exceed these obligations.

32.    The Company takes reasonable and ongoing efforts to protect its confidential, proprietary, and trade secret information.  These efforts include routinely marking such documents as confidential, restricting access on a need-to-know basis, requiring signed confidentiality agreements as a condition of employment for certain employees including executives like Rudolph, and/or implementing secure data storage and transfer protocols.

II.    **DWT Is and Has Always Been ingredientsPLUS's Competitor in the Distribution of Sweetener Products**

33.    ingredientsPLUS and DWT have been competitors in the distribution and delivery of sweetener products in the Northeast of the United States since DWT's formation in 2017.  Both companies provide logistical and transport services for food-grade sweetener products.   Like ingredientsPLUS, DWT provides "Just in Time" delivery services to the majority of its customers.

34.    Both companies are subject to the same state and federal food safety regulations as well as the food safety requirements and policies of its customers.  These substantial requirements are clearly a motivating factor in Defendants' undertaking of their Unlawful Scheme – these same

requirements motivated the Company to expend ample time and resources developing the proprietary machinery, procedures, and systems comprising the confidential and trade secret information misappropriated by Defendants.

35.     Both companies operate in the same geographical area, serving customers across the Northeastern region from their respective headquarters located just a few miles apart.

36.     In fact, some customers receiving transportation services from the Company also receive the same services from DWT.

37.     The Company engaged DWT to provide back-up trucking services on an as-needed basis in 2020.  DWT was perfectly situated to provide such back-up coverage because both companies provide the same "Just In Time" delivery services in the same geographic region.

### III.    Rudolph Is Bound by Restrictive Covenants and Confidentiality Obligations Set Forth in His Employment Agreement

38.     In 1984, Rudolph was among the first ten employees at the Company.

39.     Over the years, Rudolph has held various roles, including Production Technician, Chief of Operations and VP of Operations and Quality, and most recently, VP of Capital Projects. In these roles, and as a senior executive of the Company, Rudolph has been integral to the Company's success.

40.     In late 2018, Rudolph informed the Company that he was resigning and had accepted an offer from the Company's competitor in the non-refining sweetener product industry, Indiana Sugar (also known as New York Sugar), to become the plant manager of the new facility Indiana Sugar was building in Rochester, New York – just several miles from ingredientsPLUS's Lakeville, New York operations.

41.     The Company did not want to lose a key executive like Rudolph during the time when the Company was seeking investment from a private equity firm.  Moreover, the Company

9

was rightfully concerned about Rudolph using his substantial knowledge of the Company, amassed over decades of working for the Company, to assist Indiana Sugar in competing with ingredientsPLUS in the New York region. Accordingly, the Company entered into an agreement with Rudolph dated November 2, 2018, whereby, among other things, Rudolph was promoted to VP of Operations and Quality. A true and correct copy of Rudolph's November 2, 2018 Agreement is attached hereto as Exhibit E. Upon information and belief, after receiving this November 2, 2018 Agreement, Rudolph rescinded his acceptance of the employment offer from Indiana Sugar.

42.    Just a few months later, in May of 2019, a private equity firm, GrayCliff Partners LP, officially acquired ingredientsPLUS. At that time, GrayCliff identified key employees it wished to retain, such as Rudolph, and the Company offered to extend his employment agreement, and incentivized his retention with a promotion to the position of Vice President of Operations and Quality. Again, in an effort to head off Rudolph joining any competitor, ingredientsPLUS entered into Rudolph's Agreement, a restrictive covenant and confidentiality agreement, with Rudolph dated September 1, 2019, whereby Rudolph received, among other consideration, certain rights relating to equity ownership of the Company. *See* Ex. D.

43.    Rudolph's Agreement contains a number of restrictive covenants and a detailed Confidentiality Provision, defining "Confidential Information" as, *inter alia*, "all proprietary and/or confidential information concerning the current or future business activities and operations of the Company Group" and restricting disclosure of such confidential and/or proprietary information for a period of 12 months from the date of termination. *See* Ex. D at §12(b).

44.    Rudolph's Agreement also contains a Non-Compete Provision, defining "Competitive Activity" as "[becoming] involved directly or indirectly, as an owner, principal,

employee, officer, director, manager, independent contractor, representative, stockholder, financial backer, agent, partner, lender, or in any other individual or representative capacity" with any entity that competes with ingredientsPLUS's operations, including ingredientsPLUS's transport, logistics, distribution, and processing of sweetener-related products. *See* Ex. D at §13(a).

45.    The Non-Compete Provision restricts Rudolph from engaging in such Competitive Activity for a period of 12 months from the date of cessation of Rudolph's employment with ingredientsPLUS, and within a defined geographic zone of "350 miles from ingredientsPLUS's headquarters," and in any other jurisdiction in which ingredientsPLUS does business immediately prior to Rudolph's termination. *See* Ex. D at §13(a).

46.    Rudolph's Agreement also contains a Non-Solicitation Provision, pursuant to which Rudolph agreed to prohibit direct or indirect solicitation of the Company's *employees* for the purpose of being employed by Rudolph or his affiliates, for a period of six months before or after Rudolph's date of termination. *See* Ex. D at §13(b).

47.    The Non-Solicitation Provision also prohibits the direct or indirect solicitation of the Company's *customers or suppliers* for the purpose of ceasing doing business with any member of the Company Group, or to engage ingredientsPLUS's customers or suppliers in any Competitive Activity, for a period of 12 months from the date of ingredientsPLUS's termination. *See* Ex. D at §13(c).

48.    In addition to the express terms of Rudolph's Employment Agreement, the Company's Employee Handbook required Rudolph to maintain strict confidentiality of all such information both during and after his employment.  A true and correct copy of the applicable portion of the Company's Employee Handbook is attached hereto as Exhibit F.

**IV.     Defendants Leveraged Rudolph's Trusted Position to Unlawfully Obtain ingredientsPLUS's Confidential, Proprietary, and Trade Secret Information to Expand Defendants' Business**

49.     In May of 2024, ingredientsPLUS was acquired by American Sugar Refining. Inc. ("ASR").   Rudolph expressed discontent with the changes implemented by ASR.   Upon information and belief, Rudolph and Wolfe then ramped up their plan to take advantage of Rudolph's position as a trusted executive to further misappropriate the Company's and some of its customers' confidential and trade secret information for their own benefit.

50.     Rudolph's executive role necessitated a grant of access to a wide range of confidential and proprietary information as well as trade secrets belonging to the Company and its customers.   Such information includes the Company's business development strategies, customers' marketing strategies, customer and supplier data, logistics and supply chain information, site and engineering plans and blueprints, pricing models, internal reports, and facility operations.

51.     Beginning in or around June of 2023, Rudolph had communications with ingredientsPLUS's longtime engineering vendor, Michael Piva of Mechanical Wheelhouse ("Wheelhouse"). Wheelhouse was the vendor that constructed the Company's proprietary and efficient trailer wash system, and as such Mr. Piva was intimately familiar with the intricacies of the system.  On June 2, 2023, Wheelhouse sent Rudolph a quote to Rudolph's ingredientsPLUS email address, outlining the cost to build a trailer wash system.  Rudolph then forwarded this quote from his Company email address to his personal email.  This quote was followed by an updated quote, specifying the customer as "Derrick Wolfe Trucking LLC," to Rudolph's Company email address on June 19, 2023.



**From:** Mark Rudolph
**Sent:** Friday, June 2, 2023 10:04 AM
**To:** mkrudolph@msn.com
**Subject:** FW: [EXTERNAL]: truck wash
**Attachments:** truck wash.docx

**From:** Michael Piva <mike@wheelhousemechanical.com>
**Sent:** Friday, June 2, 2023 10:52 AM
**To:** Mark Rudolph <mrudolph@ingredientsplus.com>
**Subject:** [EXTERNAL]: truck wash

Take a look at this I can see about electrical also?

*Wheelhouse Mechanical*

Wheelhouse Mechanical LLC

1901 Landis Rd Mt Joy PA

CUSTOMER     Derrick Wolfe Trucking LLC

- PROJECT     Install Truck wash

- PROJECT LOCATION   Lakeville Ny

- QUOTED BY   Mike 717-884-1138

- DATE QUOTED   6/15/23

A true and correct copy of the June 2023 Emails are appended hereto as Exhibit G.

52.     Rudolph's soliciting these quotes (while on the clock for ingredientsPLUS) from one of the Company's own vendors indicates Defendants' intent to replicate the Company's trailer wash system for DWT, which, unlike ingredientsPLUS, did not have a trailer wash system at the

time.   Rudolph then forwarded this proposal from his ingredientsPLUS email to his personal msn.com email.

53.     In November of 2024, this part of Defendants' Unlawful Scheme came to fruition when DWT's truck wash system was completed and became operational.

54.     The pace of such misappropriation steadily increased in 2024.

55.     For instance, on Saturday, March 22, 2024, Rudolph emailed from his Company computer to his personal email address the Company's strategic plan from four years prior.  This was a strategy growth plan the Company had paid a third-party consultant, Apex Growth Strategies, to develop specific steps and strategies the Company could take to grow profits in a two-year period.  The strategy growth plan is marked "Confidential and Proprietary" information of ingredientsPLUS and was circulated and discussed among the Senior Management Team only.

**From:** Mark Rudolph
**Sent:** Friday, March 22, 2024 12:34 PM
**To:** 'Mark & Kris Rudolph'; Mark Rudolph
**Subject:** FW: Updated Full Strategic Plan
**Attachments:** SweetenersPlus Plan Framework, Draft As Of 01-29-20.pdf

**From:** Eddie Binder <ebinder@apexgrowth.com>
**Sent:** Friday, January 31, 2020 11:45 AM
**To:** Jonathan Bamberger <jbamberger@sweetenersplus.com>; Kyle Whitford <kwhitford@sweetenersplus.com>; Chris Modesti <cmodesti@sweetenersplus.com>; Mark Rudolph <mark.rudolph@sweetenersplus.com>; Mark Rudolph <mark.rudolph@sweetenersplus.com>; Michelle Squire <msquire@sweetenersplus.com>; jerryr@conleytrucking.com
**Subject:** Updated Full Strategic Plan

Hi Everyone:

Here's the full strategic plan now updated to reflect the work we did in our last meeting. All of the changes are in red, so they are easier for you to follow. Once you have been through this, please share your suggestions and I will continue updating the draft as needed.

Jonathan, let's talk next week about next steps in our process, including our next meeting.

Thanks everyone and enjoy your weekend.

Eddie

APEX GROWTH STRATEGIES
Strategies for Profitable Growth

Eddie Binder
49 Belknap Road
West Hartford, CT  06117
Office:  860.524.8655
Cell:  860.416.0189
ebinder@apexgrowth.com
www.apexgrowth.com



A true and correct copy of the March 2024 Email is appended hereto as Exhibit H.

56.    The misappropriation continued on a consistent basis throughout 2024.

57.    For instance, on April 29, 2024, Rudolph emailed from his Company computer to his personal email address *over 55 attachments* containing the Company's trade secret, confidential, and proprietary information, including (but not limited to):

      a)  2024 wash price rates.docx;

      b)  Average Costs for Washbay.docx;

      c)  Environmental Charge Price Increase.docx;

      d)  hiring revenue.xlsx;

      e)  Ingredients Plus Logistics SOP AND DOCUMENTATION.docx; and

      f)  IP Logistics Projects.docx.

A true and correct copy of the April 29, 2024 Email is appended hereto as Exhibit I.

58.    One month later, in May 2024, Rudolph also emailed to his personal email address the Company's Driver Compensation Schedule.   As mentioned, the Company developed a customized compensation incentive program for the Company's commercial drivers so that it

15

could gain a competitive edge in the marketplace in terms of driver compensation. A true and correct copy of the May 30, 2024 Email is appended hereto as Exhibit J.

59.    Rudolph's misappropriation was not limited to 2024.

60.    In fact, Rudolph's misappropriation ramped up significantly in 2025, especially in the months leading up to Rudolph's resignation in 2025.

61.    On January 9, 2025, Rudolph sent himself an email containing quotes for parts, materials, and labor needed to recreate the Company's CIP system, including documents detailing the necessary steps and analysis for a successful wash system, and a comparative analysis with the tank wash project of one of the Company's affiliates.



A true and correct copy of the January 9, 2025 Email is appended hereto as Exhibit K.

62.    On April 17, 2025, Rudolph sent himself the manual of one of the Company's valuable customers, which was marked as confidential and proprietary. By misappropriating this

16

manual (which Rudolph only had access to because of his position within the Company), Defendants can now bid against the Company for work from this customer and know exactly how to do so pursuant to this manual.  A true and correct copy of the April 17, 2025 Email is appended hereto as Exhibit L.

63.    Further, on May 6, 2025, Rudolph sent an email from his Company computer to his personal email address containing a tracking sheet that recorded ***all of the details of the customer's 2024 purchase orders*** from the Company.  This is the same customer whose manual Rudolph had misappropriated a month earlier.  Now Defendants could use both this customer's manual and previous order history to undercut ingredientsPLUS.  A true and correct copy of the May 6, 2025 Email is appended hereto as Exhibit M.

64.    Further to Defendants' Unlawful Scheme to replicate the Company's business model, on May 12, 2025, Rudolph even forwarded to his personal email address an email containing the Company's Stormwater Prevention Plan for the Lakeville facility, which the Company paid an engineering firm (Thornton Engineering LLP) to put together to safeguard its product, facilities, and environment.  By stealing this engineering plan, Defendants could adopt the same safeguards for DWT without any of the effort or costs on DWT's part and with assurance that such plan will satisfy even the most stringent customer requirements because the plan satisfies the Company's most stringent customer requirements.  A true and correct copy of the May 12, 2025 Email is appended hereto as Exhibit N.

65.    Upon information and belief, Rudolph also made and removed from the Company's premises physical copies of certain documents marked "Confidential and Proprietary."

66.    Rudolph's brazenly transgressive misappropriation extended beyond the confidential and trade secret information he encountered in the normal course of performing his

job.  With calculated deception, Rudolph also obtained and transmitted documents wholly beyond the scope of his purview.

67.    As of the date of this filing, ingredientsPLUS continues to unearth evidence of additional confidential, proprietary, and trade secret information stolen by Rudolph.  However, a non-exhaustive list of information taken includes:

a)    Documents related to the Company's proprietary CIP (Clean-In-Place) trailer wash system, including detailed procedures, plans, specifications, logistical information, installation costs, specifications, functions, notes on the process of developing the CIP system and step-by-step instructions for trailer washing.

b)    Documents related to customer-specific formulations for products as well as ingredientsPLUS's formulations for its own products.  Disclosure of this information would allow a competitor to recreate or reverse-engineer these formulations, or to tailor their offerings in such a way as to threaten the Company's existing customer relationships.

c)    The Company's confidential compensation program and rates for its commercial drivers, specifically designed for the recruitment and retention of commercial drivers and to incentivize the timely delivery of shipments.

d)    Documents containing ingredientsPLUS's most valuable clients' confidential standards for the handling and shipment of sweetener products.  Internally, this information is available to a very small group of ingredientsPLUS's trusted senior personnel.

e)    Engineering plans and proposals prepared for a grant submission seeking public funding for the Company's railway station development program.   These

18

documents are considered so sensitive that they are only available on a need-to-know basis among ingredientsPLUS's most senior executives.

f)  Documents containing high-level information about the Company's expansion strategy.

g)  Proprietary pricing, purchase order, shipment and delivery data from several customers' accounts, including customers served by both ingredientsPLUS and DWT.  Disclosure of this information would allow a competitor to undercut ingredientsPLUS's contracts and bids.

h)  Detailed rail delivery volumes and operational expectations.

i)  Internal best-practices for engaging and working with third-party vendors.

j)  Engineering and schematic information related to the Company's truck bays and liquefier systems.

k)  Floorplans, blueprints, architectural documents and engineering records related to the structure of the Company's sweetener processing plant, and modifications made to accommodate the Company's proprietary trailer wash/CIP system.

68.    Taken together, this information forms the basis of the Company's entire business model.  The disclosure of this information to a competitor like DWT will cause the Company irreparable harm.

69.    Further, Rudolph worked in the Company offices and not remotely.  The Company provided him with a Company laptop that he was able to take home as needed.  Therefore, there is no legitimate business reason for him to have emailed to his personal email the confidential, proprietary, and trade secret information of the Company and its customers.  Importantly, much of

this confidential information fell squarely outside of his job purview at the time. Rudolph lacks a valid reason for removing those documents from the Company's premises either by email or by making copies.

70.     Rudolph's conduct was in direct violation of Company policy and of Rudolph's Agreement.

**V.     Defendants are Actively Using the Confidential and Trade Secret Information Misappropriated from ingredientsPLUS to ingredientsPLUS's Direct Detriment**

71.     In short, Defendants have misappropriated nearly every piece of confidential, proprietary, and trade secret information needed to construct and operate an exact replica of ingredientsPLUS's business and to comply with the stringent customer requirements of key Company customers.

72.     As mentioned, on or around November 1, 2024, DWT opened, for the first time, its own trailer wash station. Upon information and belief, DWT has been approved by some of the Company's customers to wash trailers for them.

73.     The structural design of Defendants' trailer wash system is clearly based off of schematics used for the construction of ingredientsPLUS's own trailer wash system.

74.     Prior to DWT's launch of its trailer wash station, DWT competed with ingredientsPLUS on the level of hauling/trucking services only. With DWT's addition of its own trailer wash station, modeled after ingredientsPLUS's efficient system, together with confidential customer trailer wash specifications that Rudolph misappropriated from the Company, DWT is now in a position to further compete with the tolling services that the Company offers to its customers.

75.     The Company's tolling service includes the receipt of sweetener products by railcar to the Company's facility, the Company's physical processing of such products in accordance with

customer specification, and then the Company loading the product on trailers that have been washed in accordance with customer specifications for food-grade sweetener products, followed by "Just in Time" delivery to customers.

76.     Upon information and belief, Rudolph currently does work at DWT's trailer wash station, and the timing of the unveiling of DWT's trailer wash station, just a few months before Rudolph provided the Company with notice of his resignation, is not coincidental.   Upon information and belief, Defendants have long planned the Unlawful Scheme, with Rudolph secretly working with the Company's long-time vendor, Wheelhouse Mechanical, on a trailer wash station for DWT nearly two years ago.

77.     The next phase of Defendants' Unlawful Scheme is clear.  In addition to competing with ingredientsPLUS on the hauling/trucking side of its operations and already poaching some of the Company's customer business; upon information and belief, Defendants are on the path to expand DWT's operations to compete directly with ingredientsPLUS in providing tolling services. The first step was the trailer wash station based on ingredientsPLUS's own confidential and proprietary information.  Rudolph has also misappropriated all of the other confidential and trade secret information and know-how needed for a trucking company like DWT to directly compete with ingredientsPLUS as a toller as well.

78.     In preparation for taking this unearned advantage, Defendants have actively poached a number of ingredientsPLUS's employees across departments with specialized knowledge in ingredientsPLUS's operations.  To date, and as recently as last week, Defendants have caused the defection of commercial drivers, production and logistics managers and technicians.

**VI.**    **Defendants Have Intentionally Delayed ingredientsPLUS's Efforts to Seek Recourse**

79.     As soon as ingredientsPLUS became aware that its proprietary and confidential information had been unlawfully removed and shared with its direct competitor, the Company sent Cease-and-Desist Letters to each Defendant (the "Cease-and-Desist Letters").

80.     On July 9, 2025, ingredientsPLUS sent a letter to Rudolph via next day delivery, demanding that he: (i) immediately cease any and all competitive activities in violation of his post-employment restrictive covenants; (ii) return all Company property, including confidential and proprietary documents and data; and (iii) identify all individuals or entities to whom he disclosed, transmitted, or otherwise shared ingredientsPLUS's Confidential Information and trade secrets.  A true and correct copy of Rudolph's Cease-and-Desist Letter is annexed hereto as Exhibit O.

81.     On July 11, 2025, ingredientsPLUS also sent a letter to DWT via next day delivery, with a copy to Rudolph, notifying DWT that Rudolph is subject to restrictive covenants, including his post-employment non-compete and confidentiality provisions.  That letter further demanded that DWT immediately terminate any engagement or association with Rudolph that would violate those obligations and confirm, in writing, that Rudolph would not be permitted to use or disclose any of ingredientsPLUS's confidential information or trade secrets for DWT's benefit.  A true and correct copy of DWT's Cease-And-Desist Letter is annexed hereto as Exhibit P.

82.     As of the filing date of this Complaint, Defendants have yet to comply with ingredientsPLUS's reasonable demands to protect its confidential, proprietary, and trade secret information.

83.      Defendants' aforesaid actions and conduct constitute willful misappropriation of Defendant's trade secrets and Confidential Information, breaches of Defendant's contractual obligations to ingredientsPLUS under the Agreement, and violations and breaches of New York common law.

## CLAIMS FOR RELIEF

### Count One — Violation of the Defend Trade Secrets Act
### (As to Defendant Rudolph)

84.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

85.    ingredientsPLUS owns certain confidential, proprietary, and trade secret information, which are critical to the success of its business and operations, including without limitation the Company's pricing strategies, proprietary designs for its trailer wash system, sales plans, business models, strategic growth plans, driver compensation information and incentive programs, site and engineering plans, blueprints and costs, proprietary product formulations, logistics and transportation supply chain data, and confidential customer and vendor information. This information constitutes a "trade secret" under the DTSA.

86.    ingredientsPLUS's trade secret information is used in, or intended for use in, interstate commerce.

87.    ingredientsPLUS's trade secrets derive independent economic value from being held as a secret, and from not being readily ascertainable through proper means by, the public or others who could derive economic value from these trade secrets.

88.    ingredientsPLUS has taken reasonable steps to protect its trade secrets from disclosure, including the trade secret information stolen by Rudolph, and used by Rudolph and DWT to compete with ingredientsPLUS.

89.    ingredientsPLUS's reasonable steps to protect its trade secrets from disclosure include restricting access on a need-to-know basis, password protecting its trade secret information, and requiring individuals intended to receive access to abide by the Company's

confidentiality policies and/or sign Agreements with ingredientsPLUS containing non-compete, non-solicitation, non-disclosure, and/or confidentiality provisions.

90.    As an executive-level employee, Rudolph had knowledge of and was given access to trade secret information.  Rudolph signed Agreements with ingredientsPLUS containing non-compete, non-solicitation, non-disclosure, and confidentiality provisions.

91.    Both during and after his employment with the Company, Rudolph had a duty to maintain the secrecy of the Company's trade secrets and to not disclose them to third parties.

92.    Both during and after his employment with the Company, Rudolph misappropriated trade secrets by: (1) using improper means to acquire ingredientsPLUS's trade secrets by stealing the information without ingredientsPLUS's knowledge or consent in direct breach of his Agreement and duties owed to ingredientsPLUS; (2) disclosing the trade secrets to ingredientsPLUS's direct competitor, DWT, without ingredientsPLUS's knowledge or consent; and (3) using ingredientsPLUS's trade secrets for unauthorized purposes to ingredientsPLUS's detriment, such as by: assisting DWT in expanding its business and compete against ingredientsPLUS, soliciting ingredientsPLUS employees to work for DWT, and diverting customers and contracts away from ingredientsPLUS.

93.    Rudolph and DWT colluded to bring about this Unlawful Scheme, knowing that they had acquired ingredientsPLUS's trade secrets in circumstances giving rise to a duty to maintain their secrecy.

94.    As a result of Defendants' misappropriation of ingredientsPLUS's trade secrets, ingredientsPLUS has suffered and continues to suffer irreparable harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

95.    Defendants have also unjustly enriched themselves in an amount in excess of $75,000, the exact amount to be proven at trial.

96.    Defendants' conduct was willful, knowing, intentional, and malicious, entitling ingredientsPLUS to recovery of punitive damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

97.    Defendants willfully and maliciously misappropriated ingredientsPLUS's confidential, proprietary, and trade secret information, entitling ingredientsPLUS to an award of reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

98.    ingredientsPLUS is also entitled to preliminary and permanent injunctive relief against Defendants, to prevent further use or dissemination of the Company's trade secrets and to compel the return or deletion of all misappropriated trade secret information and materials in Defendants' possession, custody, or control.

### Count Two — Misappropriation of Trade Secrets
### (As to Defendant Rudolph)

99.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

100.    ingredientsPLUS owns certain confidential, proprietary, and trade secret information, which is critical to the success of its business and operations, including without limitation the Company's pricing strategies, proprietary designs for its trailer wash systems, sales plans, business models, strategic growth plans, driver compensation schedules, proprietary product formulations, logistics and transportation supply chain data, confidential customer and vendor information.  This information constitutes a "trade secret" under New York Common Law.

101.    ingredientsPLUS's trade secrets derive independent economic value from being held as a secret, and from not being readily ascertainable through proper means by the public or others who could derive economic value from these trade secrets.

25

102.    ingredientsPLUS has taken reasonable steps to protect its trade secrets from disclosure, including the trade secrets information stolen by Rudolph, and used by Rudolph and DWT to compete with ingredientsPLUS.

103.    ingredientsPLUS's reasonable steps to protect its trade secrets from disclosure include restricting access on a need-to-know basis, password protecting its trade secret information, and requiring individuals intended to receive access to abide by the Company's confidentiality policies and/or sign Agreements with ingredientsPLUS containing non-compete, non-solicitation, non-disclosure, and/or confidentiality provisions.

104.    As an executive-level employee, Rudolph had knowledge of and was given access to trade secret information. Rudolph signed Agreements with ingredientsPLUS containing non-compete, non-solicitation, non-disclosure, and confidentiality provisions.

105.    Both during and after his employment with the Company, Rudolph had a duty to maintain the secrecy of the Company's trade secrets and to not disclose them to third parties.

106.    Both during and after his employment with the Company, Rudolph misappropriated trade secrets by: (1) using improper means to acquire ingredientsPLUS's trade secrets by stealing the information without ingredientsPLUS's knowledge or consent in direct breach of his Agreement and duties owed to ingredientsPLUS; (2) disclosing the trade secrets to ingredientsPLUS's direct competitor, DWT, without ingredientsPLUS's knowledge or consent; and (3) using ingredientsPLUS's trade secrets for unauthorized purposes to ingredientsPLUS's detriment, such as by: assisting DWT in expanding its business and compete against ingredientsPLUS, soliciting ingredientsPLUS employees to work for DWT, and diverting customers and contracts away from ingredientsPLUS.

107.    Rudolph and DWT colluded to bring this Unlawful Scheme about knowing that they had acquired ingredientsPLUS's trade secrets in circumstances giving rise to a duty to maintain their secrecy.

108.    As a result of Defendants' misappropriation of ingredientsPLUS's trade secrets, ingredientsPLUS has suffered and continues to suffer irreparable harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

109.    ingredientsPLUS is also entitled to preliminary and permanent injunctive relief against Defendants, to prevent further use or dissemination of the Company's trade secrets and to compel the return or deletion of all misappropriated trade secrets information and materials in Defendants' possession, custody, or control.

**Count Three — Breach of Contract**
**Confidentiality Provisions**
**(As to Defendant Rudolph)**

110.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

111.    Rudolph entered into an Employment Agreement with ingredientsPLUS in 2019.

112.    The Company has fully performed all of its obligations under the Agreement.

113.    Rudolph's Agreement contained restrictive covenants that were binding on Rudolph from September 1, 2019, continuously during the period of his employment, and for 12 months after his employment ended, including its Confidentiality Provisions.

114.    The Agreement defines "Confidential Information" as "all proprietary and/or confidential information concerning the current or future business activities and operations of the Company Group." *See* Ex. D at §12(b).

115.    The Agreement specifies that Rudolph was obligated to "maintain the Confidential Information in strict confidence *at all times during and after Executive's employment*," and further states that Rudolph is prohibited from disclosing or using ingredientsPLUS's confidential information for any unauthorized purposes without prior written consent. *See* Ex. D at §12(d), (e) (emphasis added).

116.    In the event that Rudolph's employment by Plaintiff ceased for any reason, Rudolph was obligated to return any confidential information retained in his possession within 10 days. *See* Ex. D at §12(e).

117.    As an executive-level employee, Rudolph had knowledge of and was given access to ingredientsPLUS's confidential information, to be used in the normal course of performing his job.

118.    Rudolph knowingly and intentionally breached the Confidentiality Provisions by: (1) using improper means to acquire ingredientsPLUS's confidential and trade secret information by stealing the information without ingredientsPLUS's knowledge or consent; (2) disclosing ingredientsPLUS's confidential and trade secret information to ingredientsPLUS's direct competitor, DWT, without ingredientsPLUS's knowledge or consent; (3) retaining and failing to return the Company's confidential information within ten days of his last day of employment, the deadline for which was June 14, 2025.

119.    Furthermore, on July 9, 2025, ingredientsPLUS sent Rudolph a Cease-and-Desist Letter demanding, *inter alia,* that Rudolph return the Company's and customer confidential information that Rudolph had stolen. To date, Rudolph has failed to return any such confidential information.

120.    As a direct consequence of Rudolph's misconduct, ingredientsPLUS has suffered and will continue to suffer harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

121.    The harm inflicted by Defendants' conduct is such that monetary damages alone would be inadequate. ingredientsPLUS therefore seeks preliminary and permanent injunctive relief to restrain Rudolph from further breaches of his contractual obligations.

**Count Four — Breach of Contract**
**Non-Compete Provision**
**(As to Defendant Rudolph)**

122.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

123.    Rudolph's Agreement contained restrictive covenants that were binding on Rudolph from September 1, 2019, continuously during the period of his employment, and for 12 months after his employment ended, including its Non-Compete Provisions.

124.    The Agreement prohibits Rudolph from directly or indirectly engaging in or becoming associated with any "Competitive Activity" for a period of 12 months from the date of termination, and within a geographic area of 350 miles from ingredientsPLUS's Rochester, NY headquarters and in any other jurisdiction in which ingredientsPLUS does business immediately prior to Rudolph's termination. *See* Ex. D at §13(a).

125.    The Agreement defines prohibited Competitive Activity as "[becoming] involved directly or indirectly, as an owner, principal, employee, officer, director, manager, independent contractor, representative, stockholder, financial backer, agent, partner, lender, or in any other individual or representative capacity" with any entity that competes with ingredientsPLUS's operations, which includes the "purchasing, processing, packaging, or distributing sugar,

sweeteners or related products" along with the "trucking and hauling [of] food and beverage-related products[.]"  *See* Ex. D at §13(a).

126.    On or about May 5, 2025, Rudolph submitted his formal resignation from ingredientsPLUS.  A true and correct copy of Rudolph's resignation letter is annexed hereto as Exhibit Q.

127.    Upon information and belief, Rudolph accepted employment or otherwise became affiliated with DWT immediately upon, or within a few weeks after, his resignation, which is within the 12-month period during which such Competitive Activity is prohibited.

128.    Rudolph has breached, and will continue breaching, the non-compete provision of his Agreement by affiliating himself with DWT. DWT is a direct competitor of ingredientsPLUS's distribution and delivery enterprise; both businesses target customers within the same geographic zone and in many instances serve the same customers.

129.    As a direct and proximate result of Rudolph's breach of contract, ingredientsPLUS has suffered and will continue to suffer harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

130.    The harm inflicted by Defendants' conduct is such that monetary damages alone would be inadequate. ingredientsPLUS therefore seeks preliminary and permanent injunctive relief to restrain Rudolph from further breaches of his contractual obligations.

**Count Five — Breach of Contract**
**Non-Solicitation Provisions**
**(As to Defendant Rudolph)**

131.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

132.    Rudolph's Agreement contained restrictive covenants that were binding on Rudolph from September 1, 2019, continuously during the period of his employment, and for 12 months after his employment ended, including its Non-Solicitation Provisions.

133.    Rudolph's Agreement prohibits direct or indirect solicitation of ingredientsPLUS's employees for the purpose of being employed by Rudolph or any of Rudolph's affiliates, for a period of six months before or after Rudolph's date of termination.  *See* Ex. D at §13(b).

134.    Rudolph's Agreement also prohibits either direct or indirect solicitation of ingredientsPLUS's customers or suppliers for the purpose of ceasing doing business with any member of the Company Group, or to engage ingredientsPLUS's customers or suppliers in any Competitive Activity, for a period of twelve months from the date of ingredientsPLUS's termination.  *See* Ex. D at §13(c).

135.    Rudolph has breached, and will continue breaching, the Non-Solicitation Provision of his Agreement by engaging in efforts to divert current customers, prospective customers or business opportunities and/or ingredientsPLUS's suppliers away from ingredientsPLUS.

136.    As a direct and proximate result of Rudolph's breach of contract, ingredientsPLUS has suffered and will continue to suffer harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

137.    The harm inflicted by Defendants' conduct is such that monetary damages alone would be inadequate. ingredientsPLUS therefore seeks preliminary and permanent injunctive relief to restrain Rudolph from further breaches of his contractual obligations.

## Count Six — Breach of Fiduciary Duty
### (As to Defendant Rudolph)

138.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

31

139.    As an ingredientsPLUS senior executive, Rudolph owed the Company a fiduciary duty of loyalty, to act in the best interests of his employer.  Rudolph was obligated to exercise the utmost good faith in the performance of his duties, and was prohibited from misusing confidential or proprietary information entrusted to him by the Company, or otherwise contravening the duty to protect his employer's best interests.

140.    Rudolph breached this duty by, among other things: (i) misappropriating ingredientsPLUS's confidential and trade secret information; (iii) retaining ingredientsPLUS's confidential and trade secret information ; and (iv) engaging in competitive activities adverse to ingredientsPLUS's interests while still employed by ingredientsPLUS and within the non-compete period specified in Rudolph's Agreement.

141.    Rudolph's misconduct was a flagrant breach of his fiduciary duties to the Company.

142.    As a direct consequence of Rudolph's misconduct, ingredientsPLUS has suffered and will continue to suffer harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

143.    The harm inflicted by Defendants' conduct is such that monetary damages alone would be inadequate.  ingredientsPLUS therefore seeks preliminary and permanent injunctive relief to restrain Rudolph from further breaches of his contractual obligations.

### Count Seven — Tortious Interference with Business Relationships
### (As to Both Defendants)

144.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

145.    ingredientsPLUS has business relationships with each of its current employees and customers.

146.    Defendants had knowledge of ingredientsPLUS's business relationships with its employees and customers.

147.    Defendants, with malicious intent, unlawfully targeted and solicited ingredientsPLUS's employees, to induce them to terminate their business relationship with ingredientsPLUS and enter into business relationships with DWT, ingredientsPLUS's competitor.

148.    Defendants made these solicitations without justification and with malicious intent to harm the Company.

149.    Defendants' solicitations were successful and several of ingredientsPLUS's employees, including one that has been an employee since 2006 and is integral to the Company's operations, have recently terminated their business relationships with IngredientsPLUS and stated their intent to take the same position as an employee of DWT.

150.    As a direct and proximate result of Defendants' malicious solicitations, ingredientsPLUS must now incur the significant time and expense of searching for, hiring, training, and retaining new employees.  Even once new employees are hired, ingredientsPLUS will never regain the benefit of these former employees' personal experience and knowledge of ingredientsPLUS's operations amassed over several years.

151.    Defendants, with malicious intent, also unlawfully targeted and solicited ingredientsPLUS's customers, to induce them to divert business away from ingredientsPLUS.

152.    Defendants are actively pursuing Plaintiff's existing customers by using the confidential, proprietary, and trade secret information they unlawfully acquired from ingredientsPLUS.

153.    Defendants made these solicitations without justification and with malicious intent to cause harm to ingredientsPLUS.

154.    Defendants have already successfully diverted business away from ingredientsPLUS and to DWT as a direct result of Defendants' solicitations, thereby causing lost profits to ingredientsPLUS.

## Count Eight — Tortious Interference with Contract
### (As to Both Defendants)

155.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

156.    ingredientsPLUS maintains valid contractual relationships with its current and former customers, suppliers, and vendors.  These contracts contain, among other things, non-disclosure agreements ("NDAs").

157.    These NDAs prohibit the use or disclosure to others of ingredientsPLUS's confidential and trade secret information relating to its customers, suppliers, and vendors.

158.    Upon information and belief, Defendants, knowing that these individuals and entities were contractually bound to confidentiality, have intentionally and without justification induced, attempted to induce, and continue to attempt to induce those individuals and entities to breach their contractual obligations.

159.    Specifically, upon information and belief, Defendants have used and/or disclosed confidential, proprietary, and trade secret information – including pricing models, logistics plans, and technical documentation – obtained during Rudolph's employment with ingredientsPLUS to solicit and divert business opportunities and relationships away from the Company, in violation of the contractual rights obligations owed to the Company.

160.    Defendants conduct was undertaken without justifications and with malicious intent to cause harm to ingredientsPLUS.

34

161.    As a direct and proximate result of Defendants' malicious solicitations, ingredientsPLUS must now incur the significant time and expense of rebuilding its relationships with those customers, suppliers, and vendors.

162.    As a direct consequence of Rudolph's misconduct, ingredientsPLUS has suffered and will continue to suffer harm, as well as money damages in excess of $75,000, the exact amount to be proven at trial.

163.    The harm inflicted by Defendants' conduct is such that monetary damages alone would be inadequate. ingredientsPLUS therefore seeks preliminary and permanent injunctive relief to restrain Rudolph from further breaches of his contractual obligations.

## Count Nine — Conspiracy
### (As to Both Defendants)

164.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

165.    Both during and after Rudolph's employment with ingredientsPLUS, Defendants, acting with malice, entered into an agreement or common plan to harm ingredientsPLUS and its contractual relationships, to unlawfully appropriate ingredientsPLUS's confidential, proprietary, and trade secret information for their own pecuniary gain as Defendants worked in concert with DWT to compete directly with ingredientsPLUS.

166.    In carrying out their plan, Defendants have committed unlawful acts, including tortious interference with ingredientsPLUS's contractual and business relationships, in addition to the misappropriation of ingredientsPLUS's confidential and trade secret information, and breach of contract.

167.    Defendants conduct was calculated, premeditated, intentional, malicious, and willful and was done with reckless disregard for the probable adverse consequences to ingredientsPLUS.

168.    As a result of Defendants' civil conspiracy, ingredientsPLUS has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in excess of $75,000, the exact amount to be proven at trial.

169.    Defendants' unlawful conduct was willful, knowing, intentional, and malicious, entitling ingredientsPLUS to recovery of punitive damages.

## Count Ten — Replevin
## (As to Both Defendants)

170.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

171.    ingredientsPLUS has a lawful and superior possessory right to the confidential, proprietary, and trade secret information that Rudolph wrongfully acquired in the course of his employment and has unlawfully retained since the cessation of his employment.

172.    Defendants possess no lawful right to retain or use ingredientsPLUS's confidential, proprietary, and trade secret information, including but not limited to engineering plans, internal reports, customer data, pricing models, transportation and logistics strategies, and any documents containing the Company's or its customers' or vendors' proprietary or customer-protected information.

173.    ingredientsPLUS's July 9, 2025 Cease-and-Desist Letter to Rudolph demanded that he: (i) immediately cease any and all competitive activities in violation of his post-employment restrictive covenants; (ii) return all Company property, including confidential and proprietary documents and data; and (iii) identify all individuals or entities to whom he disclosed, transmitted,

or otherwise shared ingredientsPLUS's Confidential Information and trade secrets. The letter further demanded confirmation in writing that these demands had been satisfied. *See* Exhibit O.

174.    ingredientsPLUS's July 11, 2025, Cease-and-Desist Letter to DWT demanded that DWT immediately terminate any association with Rudolph that would violate the restrictive covenants by which Rudolph remains bound, and demanded that DWT confirm in writing that this had been done. *See* Exhibit P. The July 11, 2025 Cease-and-Desist Letter to DWT further demanded that DWT immediately return to ingredientsPLUS's "all of the Company's Confidential Information, and within three (3) business days of the date of the letter, identify in writing all Confidential Information shared (orally or in writing) by Rudolph with DWT, Derrick Wolfe and/or anyone employed by or associated with DWT" during the relevant time period.

175.    Despite these demands, Defendants have failed to terminate their association with Rudolph, failed to return the Company's confidential information and trade secrets, and failed to identify in writing all Company confidential information used or shared with anyone.

176.    Defendant's continued unauthorized possession of ingredientsPLUS's property is wrongful, and in violation of Rudolph's contractual and common law obligations.

177.    ingredientsPLUS has been and continues to be harmed by Defendants' wrongful retention and use of the Company's confidential information and trade secrets.

178.    Equity requires that Defendants return to the Company any and all confidential information and trade secrets belonging to ingredientsPLUS and unlawfully retained by Defendants, in addition to any related proprietary materials currently in Defendants' possession, custody, or control.

## Count Eleven — Unjust Enrichment

### (As to Both Defendants)

179.    ingredientsPLUS realleges and incorporates all allegations contained in Paragraphs 1-83 above as though fully set forth herein.

180.    Defendants have stolen ingredientsPLUS's confidential, proprietary, and trade secret information and used that misappropriated information to unlawfully target and solicit several of the Company's employees, including commercial drivers and a logistics manager. These employees have terminated their employment with the Company as a direct result of Defendants' solicitations, and are now employed by DWT.

181.    Defendants have stolen ingredientsPLUS's confidential, proprietary, and trade secret information and used that misappropriated information to unlawfully target and solicit several of the Company's most valued customers.

182.    Defendants have benefitted, and continue to benefit, from their receipt and use of ingredientsPLUS's confidential, proprietary, and trade secret information because ingredientsPLUS's customers have diverted business away from ingredientsPLUS.  At least one of ingredientsPLUS's customers has informed ingredientsPLUS that it does not plan to use its services in the coming year, and several more have been identified as high-risk for terminating their contracts.

183.    Defendants are aware of the benefits they have received.

184.    Under the circumstances, it would be unjust to allow Defendants to retain the benefits they received without payment to ingredientsPLUS.

185.    Defendants have been unjustly enriched, and continue to be unjustly enriched in an amount in excess of $75,000, the exact amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, ingredientsPLUS respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

1. On Counts One and Two (Violation of the Defend Trade Secrets Act and State Trade Secret Law), compensatory damages, exemplary (punitive) damages, disgorgement of unjust enrichment, attorneys' fees, and preliminary and permanent injunctive relief to prevent further use, disclosure, or dissemination of ingredientsPLUS's trade secrets, and to compel the return or destruction of misappropriated materials;

2. On Counts Three, Four, and Five (Breach of Contract), compensatory damages, restitution or disgorgement of profits wrongfully obtained, enforcement of any applicable liquidated damages provision, specific performance of any surviving contractual obligations, and injunctive relief enforcing confidentiality, non-solicitation, or non-compete provisions; and injunctive relief to restrain further violations;

3. On Count Six (Breach of Fiduciary Duty), compensatory and punitive damages, attorneys' fees, and injunctive relief prohibiting further misuse or retention of ingredientsPLUS's confidential information;

4. On Counts Seven and Eight (Tortious Interference with Contractual Relationships and Tortious Interference with Contract), compensatory and punitive damages, restitution or disgorgement of profits obtained through the interference, and injunctive relief to prevent future interference with ingredientsPLUS's contractual and business relationships;

5. On Count Nine (Conspiracy), monetary and punitive damages;

6. On Count Ten (Replevin), an order directing the immediate return of ingredientsPLUS's property, including all confidential, proprietary, or trade secret materials, and damages for any loss, destruction, or misuse of such property;

7. On Count Eleven (Unjust Enrichment); disgorgement of any unjust enrichments to be proven in trial.

Such other and further relief as this Court deems just and proper.

Dated: August 18, 2025
New York, New York

Respectfully submitted,
NORTON ROSE FULBRIGHT US LLP

By: /s/ David A. Moreno
    David A. Moreno Jr.
1301 Avenue of the Americas
New York, New York  10019-6022
Tel.:    (212) 318-3120
Fax:    (212) 318-3400
david.moreno@nortonrosefulbright.com
*Attorneys for Plaintiff*