UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SWEETENERS PLUS, LLC,

                              Plaintiff,

                  -v-

MARK RUDOLPH, *et al.*,

                              Defendants.

---

25-CV-6845 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Before this Court is a motion for a preliminary injunction filed by Plaintiff Sweeteners

Plus, LLC,[1] d/b/a ingredientsPLUS ("ingredientsPLUS") against Defendants Mark Rudolph and

Derrick Wolfe Trucking, LLC ("DWT") (collectively, "Defendants").  ingredientsPLUS seeks an

order preliminarily enjoining Defendants from using or disclosing its confidential information,

compelling the immediate return and deletion of all such information, and enforcing restrictive

covenants in Rudolph's employment agreement.  This Court held an evidentiary hearing on

November 19, 2025, and November 20, 2025, on the motion for a preliminary injunction.  For

the reasons that follow and based on the record developed at these hearings, the Court concludes

that ingredientsPLUS is entitled to limited preliminary injunctive relief as to Rudolph's alleged

breach of the confidentiality provision in his employment agreement.  However, the Court

concludes that no additional relief is warranted.

---

[1] The caption currently lists Plaintiff's name as Sweetners Plus, LLC, but in all of its
filings, Plaintiff refers to itself as Sweeteners Plus, LLC.  Accordingly, the Clerk of Court is
respectfully directed to amend the case caption.

1

## I.      Findings of Fact

The Court makes the following findings of facts based on the parties' submissions and the testimony and exhibits offered at the hearings held on November 19, 2025, and November 20, 2025.

### A.      Background

ingredientsPLUS is a processing and distribution company headquartered in Rochester, New York, with operations in Lakeville, New York and Landisville, Pennsylvania.  (ECF No. 15-2 ("Whitford Decl. I") ¶ 3; ECF No. 11 ("Compl.") ¶ 24.)  ingredientsPLUS has two business units, a sweetener processing business unit and a logistics and transport business unit.  (ECF No. 39 ("Whitford Decl. II") ¶ 3.)  A substantial majority of ingredientsPLUS's business involves the two units working in tandem under a "tolling" model, pursuant to which the processing unit manufactures and packages food-grade sweetener products like sugar and liquid sucrose, and the transport unit offers "Just-in-Time" delivery of its sweetener products to customers within a 350-mile radius from the company's facilities.  (Whitford Decl. I ¶ 6; Whitford Decl. II ¶¶ 3, 6.)  Prompt delivery is a critical aspect of the business, as liquid sweeteners have a shelf life of only about ten days and many customers have even more limited storage capacity.  (ECF No. 52 ("Nov. 19 Tr.") at 31.)  ingredientsPLUS typically requires customers of its sweetener products to use the company for all aspects of the tolling, including "Just-in-Time" delivery.  (Whitford Decl. II ¶ 5.)  A small percentage of ingredientsPLUS's business comes from freighting non-sweetener food products that it does not manufacture.  (Nov. 19 Tr. at 17.)  ingredientsPLUS operates its own truck washing station to ensure compliance with various food safety regulations and customer-specific requirements.  (Whitford Decl. II ¶ 4.)

To preserve the confidentiality of its confidential and proprietary information, ingredientsPLUS uses a Sharepoint system that houses all of its electronic files and segregates

those documents into permission-based groups.  (ECF No. 54 ("Nov. 20 Tr.") at 139.)  Policies and employee files are housed in an online system controlled by the human resources team, where permission is given to employees to view only their own documents.  (*Id.*)  ingredientsPLUS also has an employee handbook that prohibits forwarding emails containing confidential information externally or to unnecessary people.  (ECF No. 15-4 at 5.)

Rudolph joined ingredientsPLUS in 1984 as a production technician.  (ECF No. 34 ("Rudolph Decl.") ¶ 4.)  In 2019, he was promoted to the position of Vice President of Operations and Quality.  (Whitford Decl. I ¶ 16.)  In exchange for the promotion, which awarded Rudolph certain equity rights in the company, Rudolph signed an Employment Agreement.  (ECF No. 15-3.)  As Vice President of Operations and Quality, Rudolph led operations, which involved overseeing the daily operations of manufacturing, logistics, and transport, as well as developing and implementing standard operating procedures and best practices.  (ECF No. 40 ("Pacheco Decl.") ¶ 3; Nov. 19 Tr. at 78.)  Rudolph was involved in high-level company strategy and had access to confidential customer information.  (Nov. 19 Tr. at 22.)  His responsibilities included overseeing truck loading and product manufacturing.  (*Id.* at 20.)  Rudolph was also responsible for ensuring quality, meaning that he would sometimes interact with customers.  (*Id.* at 20, 78.)  For example, when a then-prospective customer, Cargill, approached ingredientsPLUS, Rudolph was tasked with ensuring that the company could make facility modifications to comply with Cargill's specifications regarding product segregation, air filtration, and wash.  (*Id.* at 86.)  However, Rudolph's job duties did not involve sales or meeting with customers to discuss their contracts or delivery logistics.  (*Id.* at 113, 120.)  Rudolph's job also did not involve overseeing the daily operations of the logistics and transport team or entailing maintenance of ingredientsPLUS's fleet.  (*Id.* at 23, 92-93.)

At the start of 2025, Rudolph accepted the position of Vice President of Capital Projects. (*Id*. at 115-16.)  In his new role, Rudolph oversaw growth-related initiatives, including projects involving automation and expansion, and worked with ingredientsPLUS's parent company to design and build a new facility.  (*Id*. at 108-09.)

Around 2020, ingredientsPLUS hired Derrick Wolfe as a logistics manager.  (Compl. ¶ 6.)  Wolfe, who had worked as a trucking and station manager at ADM Corn Processing for ten years before joining ingredientsPLUS, is also the owner and CEO of DWT, a trucking company he started in 2017 that hauls various food and non-food commodities, with a focus on food-grade liquids, for third-party providers and customers.  (Whitford Decl. I ¶ 12; ECF No. 32 ("Wolfe Decl.") ¶ 3; Nov. 20 Tr. at 147-48.)  Wolfe owned and operated DWT while he was a logistics manager at ingredientsPLUS, and the company did not seek to enjoin Wolfe from operating DWT.  (Nov. 19 Tr. at 72-73; Nov. 20 Tr. at 148, 157-58.)  In 2021, Wolfe resigned from ingredientsPLUS to focus on DWT.  (Compl. ¶ 6.)

As a third-party trucking company, DWT often serves as a backup carrier for companies like ingredientsPLUS that have their own trucking fleet but occasionally need help with excess loads or volumes.  (Wolfe Decl. ¶ 5.)  Indeed, from 2019 to June of this year, DWT served as such a backup carrier to ingredientsPLUS.  (*Id.* ¶¶ 17-18; Nov. 20 Tr. at 149.)  DWT also provides transportation services to manufacturers that do not have their own fleets and for customers that opt out of a manufacturer's hauling services and choose to use DWT's hauling services.  (Wolfe Decl. ¶ 10.)  Like ingredientsPLUS, DWT offers "Just-in-Time" delivery. (Whitford Decl. I ¶ 12.)  In 2024, DWT launched a trailer washing station to ensure the cleanliness of its trailers used in food product transportation.  (*Id.* ¶ 14; Wolfe Decl. ¶¶ 28, 44.) To implement the wash station, Wolfe worked with engineer Mike Piva, part owner of

Wheelhouse Mechanical and one of ingredientsPLUS's contractors who had access to ingredientsPLUS's washing station. (Nov. 20 Tr. at 188; Pacheco Decl. ¶ 14.) Unlike the wash system used by ingredientsPLUS, DWT's system is built to handle a variety of sweetener and non-sweetener products. (Wolfe Decl. ¶ 42; Nov. 20 Tr. at 163-64.) Accordingly, DWT uses chemical treatments in its washes and a single pass method in which cleaning liquid used on the trailer is not recirculated and used again. (Nov. 20 Tr. at 166.) In contrast, ingredientsPLUS's system recirculates the water and does not use chemical treatments. (*Id.*) Additionally, DWT's system uses high-pressure and low-volume water, whereas ingredientsPLUS's system uses high-volume and relatively low-pressure water, and DWT uses four burners to heat water on-demand, whereas ingredientsPLUS uses a boiler that preheats the water. (*Id.* at 165-66.)

One of DWT's customers is Indiana Sugars, a liquid sweetener company based in Rochester, New York, and one of ingredientsPLUS's largest manufacturing competitors. (Nov. 19 Tr. 24-25, 60.) Unlike ingredientsPLUS, Indiana Sugars does not have its own fleet of trucks, and so it relies on outside carriers like DWT. (*Id*. at 28.) DWT has most of the company's hauling business in the Rochester area and is a carrier of choice for the company, although Indiana Sugars also contracts with two other carriers in the area. (*Id*. at 117; Nov. 20 Tr. at 152-53, 177.) DWT and ingredientsPLUS also share a few customers, including Baldwin Richardson Food, Miss Can America, and Kerry. (Nov. 19 Tr. at 26.) Although ingredientsPLUS considers Cargill another shared customer, Wolfe testified that DWT has not yet had a direct hauling relationship with Cargill and has only hauled Cargill products through Cargill customers who arranged the freight. (*Compare id. with* Nov. 20 Tr. at 150.)

In June 2025, ingredientsPLUS was informed by Baldwin Richardson Food that the company would no longer contract any business with ingredientsPLUS and would instead be

purchasing from Indiana Sugars.  (Nov. 19 Tr. at 29, 66.)  DWT has also lost a significant part of its Baldwin Richardson business because Indiana Sugars partnered with Baldwin to pump Indiana Sugars' sweeteners over instead of hauling it.  (Nov. 20 Tr. at 179.)  Another longtime ingredientsPLUS client, Creative Food Ingredients, informed the company it would not renew its contracts in 2026.  (Nov. 19 Tr. at 29.)  Several other customers have yet to book or contract with ingredientsPLUS for 2026.  (*Id.* at 31.)

### B.    The Agreement

In 2019, Rudolph and ingredientsPLUS signed an "Employment Agreement" (the "Agreement"), pursuant to which Rudolph agreed to certain confidentiality, non-compete, and non-solicitation obligations.  (ECF No. 15-3.)  Section 12 of the Agreement defines "Confidential Information" as "all proprietary and/or confidential information concerning the current or future business activities and operations of [ingredientsPLUS]," including "unpatented inventions, designs; discoveries or improvements; marketing, research and development, or business plans; sales forecasts; personnel information, . . . pricing, costing and financial information; [and] current and prospective customer[s], vendors, and supplier lists."  (*Id.* at § 12(b).)  "Upon termination of employment . . . , [Rudolph] shall not use the Confidential Information for any reason or disclose it to any Person," and Rudolph "shall . . . promptly, but within no later than ten (10) days from the date [Rudolph's] employment is terminated hereunder, return to [ingredientsPLUS], without retaining copies, all items which are or which contain Confidential Information."  (*Id.* at § 12(e).)

Section 13 of the Agreement sets out a series of restrictive covenants.  Under the non-compete provision, until the "1st . . . anniversary of the effective date of [Rudolph's] Termination (the 'Restricted Period'), [Rudolph] shall not, directly or indirectly, . . . engage in or

6

become associated with a Competitive Activity."[2]  (*Id.* at § 13(a).)  "'Competitive Activity' shall mean, within 350 miles of [ingredientsPLUS] Headquarters, . . . being engaged in the Business," and "'Business' means, individually and collectively, (A) the business of purchasing, processing, packaging or distributing sugar, sweeteners or related products, . . . (B) the business of trucking and hauling food and beverage-related products, and (C) each other business of [] any member of [ingredientsPLUS]."  (*Id.*)  Rudolph violates the non-compete if he, among other things, becomes an employee of any organization engaged in a Competitive Activity.  (*Id.*)

Section 13 also sets out two non-solicitation restrictions.  First, "during the Restricted Period, [Rudolph] shall not . . . directly or indirectly[] solicit, recruit or hire any employee . . . of any member of [ingredientsPLUS] for the purpose of being employed by, or otherwise provide services to, [Rudolph] or any Person on whose behalf [Rudolph] is acting as an agent, representative, employee or otherwise."  (*Id.* § 13(b).)  Second, "during the Restricted Period, [Rudolph] shall not, directly or indirectly, . . . persuade or encourage or attempt to persuade or encourage any business customer, partner, affiliate, supplier, or vendor of any member of [ingredientsPLUS] to cease doing business with any such member of [ingredientsPLUS] or to engage in any Competitive Activity on its own or with any Competitor of any member of [ingredientsPLUS]."  (*Id.* § 13(c).)

## C.    Rudolph's Departure from ingredientsPLUS

Wolfe and Rudolph have known each other since Wolfe was a child.  (Nov. 20 Tr. at 154.)  Earlier this year, Rudolph informed Wolfe that he planned to leave ingredientsPLUS,

---

[2] The Agreement ambiguously provides that the non-compete obligation runs until "the third (1st) anniversary of the effective date of [Rudolph's] Termination," but the parties agreed at oral argument that it imposes a one-year restriction.  (*See also* ECF No. 15-1 at 12.)  Accordingly, the Court adopts the parties' reasonable interpretation of the Agreement.

saying that he felt obsolete in the months after American Sugar Refining acquired ingredientsPLUS. (*Id*. at 154-55.) In response, Wolfe offered Rudolph a job at DWT. (*Id.*)

Rudolph submitted a resignation letter to ingredientsPLUS in May of 2025 and worked his last day for the company on June 4, 2025. (ECF No. 15-18.) Rudolph shortly thereafter began working for DWT as Chief Operating Officer. (Whitford Decl. I ¶ 32; Nov. 19 Tr. at 109.) Rudolph testified that he does not own any equity in DWT, does not share in its profits and losses, and does not receive a bonus. (Nov. 19 Tr. at 132.) At DWT, Rudolph oversees the operations of the truck shop, which includes overseeing the truck and trailer maintenance schedule, wash bay operations, compliance in the truck shop, shop inventory, and labor. (Nov. 19 Tr. at 109-10; Nov. 20 Tr. at 156.) In overseeing the truck shop, Rudolph directs the work of the employees maintaining the tractor trailers, which was not part of his job duties at ingredientsPLUS. (Nov. 19 Tr. at 110.) Rudolph also performs maintenance on the wash system himself, occasionally drives for DWT, and is developing and implementing a standard operating procedure for DWT's burgeoning plastics transport business. (*Id.* at 110-11.)

Soon after Rudolph resigned from ingredientsPLUS, Tiffany Anzalone resigned from her position as logistics manager at ingredientsPLUS and began working for DWT as a dispatcher, where she tracks shop inventory, dispatches loads to drivers, and does work orders for in-house equipment. (Nov. 19 Tr. at 88, 121; Nov. 20 Tr. at 175.) The morning of her departure, Anzalone worked on a bidding process for Kerry. Since then, ingredientsPLUS lost a bid for work at one Kerry location. (Nov. 19 Tr. at 88, 90.) Rudolph credibly testified that he did not tell Anzalone about his new position at DWT until she saw him there during her interview, and that he did not encourage her to leave ingredientsPLUS for DWT. (*Id*. at 113, 122-23.) Defendants also submitted an email from Anzalone to Wolfe on June 17, 2025, asking about

8

available positions at DWT.  (ECF No. 32-1.)  The email, and a signed agreement by Anzalone stating that she was not solicited to DWT, supports Wolfe's testimony that he did not reach out to Anzalone to hire her.  (Nov. 20 Tr. at 183-84; *see also* ECF No. 32-2.)  Wolfe also credibly testified that Anzalone has not worked on preparing bids at DWT, that DWT did not win the Kerry bid that ingredientsPLUS lost, and that another trucking company, Oakley, won that bid.  (Nov. 20 Tr. at 151-52, 170.)  A former production manager at ingredientsPLUS, Corey Mahaney, has also departed to work for DWT as a truck driver.  (Nov. 19 Tr. at 132.)  Another former ingredientsPLUS employee, Stacey Converse, now works for DWT as a truck mechanic.  (*Id.* at 132-33.)  Rudolph testified that he did not introduce Mahaney or Converse to Wolfe.  (*Id.*)

A number of communications Rudolph made while he was still employed by ingredientsPLUS are relevant to this motion.  First, starting in 2022 and continuing until he ended his employment in June of 2025, Rudolph sent approximately 700 documents from his ingredientsPLUS email to his personal email.  (Whitford Decl. I ¶¶ 17-30.)

ingredientsPLUS offered a handful of these 700 emails as exhibits.  In January of 2023, Rudolph emailed himself a manual for one of ingredientsPLUS's clients, Cargill, that sets out Cargill's specifications for outside carriers and wash stations that handle its sweeteners.  (ECF No. 17-8.)  Rudolph sent himself the materials around the time that he was working on ensuring compliance with Cargill's specifications.  (Nov. 19 Tr. at 87.)  The manual is labelled confidential and proprietary.  (ECF No. 17-8.)  In March of 2024, Rudolph emailed himself a copy of ingredientsPLUS's strategic growth plan from four years prior.  (ECF No. 17-4.)  That plan was shared with only six or seven high-level ingredientsPLUS employees.  (Nov. 19 Tr. at 35.)  On April 29, 2024, Rudolph emailed himself dozens of attachments containing ingredientsPLUS's logistics operations and customer pricing information.  (ECF No. 17-5.)  On

May 30, 2024, Rudolph emailed himself a copy of ingredientsPLUS's "Hours of Service and Driver Compensation Policy" (the "Driver Compensation Policy"). (ECF No. 17-6.)  In May of 2025, Rudolph emailed himself a copy of ingredientsPLUS's stormwater pollution prevention plan for its Lakeville facility and the company's cost analysis for the 2023 expansion of its Landisville facility. (ECF No. 17-7; Rudolph Decl. ¶ 24.)  That same month, shortly after he submitted his resignation, he sent himself a tracking sheet for Cargill. (ECF No. 17-10.)  Wolfe testified that Rudolph never sent him any of these documents. (Nov. 20 Tr. at 199.)

Rudolph's supervisor from May of 2023 to June of 2024, Victor Pacheco, stated that Rudolph was never asked to work after hours, that he should have been using a company-issued laptop to do work after hours or from home, and that many of these documents were outside the scope of Rudolph's role. (Nov. 19 Tr. at 80, 92; Pacheco Decl. ¶ 7.)  However, Pacheco recognized that he did not assign each and every one of Rudolph's work tasks and that Rudolph could have been assigned outside work without his awareness. (Nov. 19 Tr. at 93, 95.)  Rudolph, in turn, testified that he sent those emails to himself to work from home after regular business hours without having to bring his work laptop home, that these documents were used solely for work, and that he received assignments from others besides Pacheco. (*Id.* at 111-13.)  For example, Rudolph explained that he sent himself the Cargill tracking sheet because the work force was having issues with inputting entries into the document, and he was working on resolving those issues. (*Id.* at 111-12.)  He also testified that he has not shared any of these documents (save the limited few discussed below) with anyone outside of ingredientsPLUS, and that he has not used or solicited anyone else to use those documents to prepare bids at DWT. (*Id.* at 125-26.)  Rudolph admitted that some of these documents, like the strategic growth plan, are confidential and that he did not return them upon termination. (*Id.* at 124-25.)  Rudolph also

admitted that he has utilized a template for a log sheet that he emailed himself while at ingredientsPLUS in his new role at DWT.  (*Id.* at 131.)

Second, in June of 2023, Piva sent an email to Rudolph's ingredientsPLUS account providing a quote for DWT's wash system.  (ECF No. 17.)  Rudolph testified that he introduced Wolfe to Piva after Wolfe told him about DWT's plans to install its own wash system, but that was his only involvement.  (Nov. 19 Tr. at 127, 133.)  Wolfe similarly testified that Rudolph's only role was making the introduction.  (Nov. 20 Tr. at 164.)  Rudolph testified that he did not understand why Piva sent him the quote, and that he assumed it was a mistake and forwarded it to Wolfe.  (Nov. 19 Tr. at 127.)

Third, ingredientsPLUS alleges that Rudolph shared confidential information with Wolfe while employed at ingredientsPLUS.  In May 2024, Rudolph sent himself the Driver Compensation Policy, and Rudolph's declaration states that he then shared the document with Wolfe in the hopes of sourcing a candidate for the driver role.[3]  (ECF No. 17-6; Rudolph Decl. ¶ 21.)  ingredientsPLUS witnesses testified that the Driver Compensation Policy is confidential. (*See, e.g.*, Nov. 19 Tr. at 82-83.)  Wolfe testified that DWT's driver compensation policy has not changed since it was created in 2017.  (Nov. 20 Tr. at 162.)

Also in May of 2024, Rudolph sent Wolfe an updated trailer fleet list (the "Fleet List"), which enumerated ingredientsPLUS's tractors alongside certain information like mileage and unload weight.  (ECF No. 17-3.)  Pacheco testified that the Fleet List was confidential and that ingredientsPLUS did not provide information to third-party carriers regarding its fleet.  (Nov. 19

---

[3] Rudolph's declaration is the only evidence in the record that Rudolph shared the Drivers Compensation Policy with Wolfe, and the actual email is not in the record before this Court.  At oral argument, there was some confusion over whether this document had actually been disclosed to Wolfe.  The Court credits Rudolph's sworn statement that he shared the Drivers Compensation Policy with Wolfe.

Tr. at 84-85.) However, Pacheco recognized that third-party carriers require some information, like the trailer number and how much product is on a trailer. (*Id.* at 85.) Wolfe testified that the additional information included in the Fleet List, such as make, model, and serial number, is necessary to share with third-party haulers for logistics reasons—for example, because haulers need to add any overweight trailers to their overweight permits. (Nov. 20 Tr. at 160.) In February 2025, Rudolph forwarded Wolfe an email concerning a shortage of two sweetener products at ingredientsPLUS's Lakeville facility. (ECF No. 17-9.)

### D.    Procedural Background

ingredientsPLUS filed the complaint in this case against Rudolph and DWT on August 19, 2025. (ECF No. 1.) On August 29, 2025, ingredientsPLUS moved for a preliminary injunction and for expedited discovery in the event that the Court decided to hold an evidentiary hearing. (ECF No. 15.) ingredientsPLUS filed an accompanying memorandum of law (ECF No. 15-1 ("Mem.")) and various declarations and exhibits. ingredientsPLUS then filed a "Declaration of Service" on September 9, 2025 alleging that it perfected service on that day. (ECF No. 19.) On October 3, 2025, after Defendants failed to respond within the permitted time, this Court ordered a response by October 10, 2025. (ECF No. 20.) ingredientsPLUS then filed affidavits of service stating that it perfected service on October 1, 2025. (ECF Nos. 25, 26.) Defendants then sought a two-week extension of time to respond to the preliminary injunction motion, partly on the basis that service had not been perfected on September 9, 2025. (ECF No. 27.) This Court granted the request, and Defendants filed their respective oppositions on October 24, 2025, along with accompanying declarations. (ECF No. 33 ("DWT Opp."); ECF No. 35 ("Rudolph Opp.").) ingredientsPLUS then filed a reply. (ECF No. 41.)

On November 19, 2025, the Court held an in-person hearing.  (*See* Nov. 19 Tr.)  The hearing continued remotely on November 20, 2025.  (*See* Nov. 20 Tr.)  On December 11, 2025, the Court held telephonic oral argument on the motion.

## II.     Legal Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quotation marks omitted) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  "A party seeking a preliminary injunction must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'"  *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## III.    Conclusions of Law

ingredientsPLUS seeks to: (1) enjoin Defendants from using or disclosing any of its or its customers' confidential, proprietary, or trade-secret information; (2) compel the immediate return and deletion of all such information and any derivative materials; and (3) enforce Rudolph's non-compete, non-solicitation, and confidentiality obligations for their full contractual periods.  (Mem. at 8.)  It alleges that it is likely to succeed on the merits of its claims against Rudolph for breach of contract and under the Defend Trade Secrets Act and New York common law for misappropriation of trade secrets, and against both Rudolph and DWT under New York common law for tortious interference.[4]  (*See generally id.*)

---

[4] Although ingredientsPLUS brings other claims in its complaint (Compl. ¶¶ 164-185), it does not rely on these claims in its briefing on the preliminary injunction motion.  Accordingly,

The Court concludes that preliminary relief is warranted as to Rudolph's alleged breach of the confidentiality provision in the Agreement. However, ingredientsPLUS's remaining requested relief is denied, as the company has failed to demonstrate a likelihood of success on its other claims.

### A.      Likelihood of Success on the Merits

#### 1.      Breach of Contract

ingredientsPLUS argues that it is likely to succeed on the merits of its argument that Rudolph breached the confidentiality, non-compete, and non-solicitation provisions of the Agreement. The Court takes each in turn, applying New York law as required under the terms of the Agreement. (ECF No. 15-3 § 20(j).) Under New York law, a plaintiff asserting a breach of contract claim must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011).

#### a.      Confidentiality

The confidentiality provision of the Agreement requires Rudolph to "maintain the Confidential Information in strict confidence at all times," that "[u]pon termination of employment with [ingredientsPLUS] for any reason, . . . [Rudolph] shall not use the Confidential Information for any reason or disclose it to any Person," and that Rudolph "shall . . . promptly, but within no later than ten (10) days from the date [Rudolph's] employment is terminated hereunder, return to [ingredientsPLUS], without retaining copies, all items which are or which contain Confidential Information." (ECF No. 15-3 §§ 12(d), 12(e).) The section defines

---

the Court considers only the claims raised in the briefing for purposes of its likelihood of success analysis.

Confidential Information as "all proprietary and/or confidential information concerning the current or future business activities and operations of the Company Group, including . . . marketing, research and development, or business plans; sales forecasts; personnel information . . .; methodologies employed by any member of the Company Group in providing services to their respective customers; pricing, costing and financial information; . . . and information on customers, vendors, suppliers or their employees." (*Id.* § 12(b).)

ingredientsPLUS is likely to succeed in showing that Rudolph has breached the part of the Agreement requiring him to return to ingredientsPLUS all documents containing Confidential Information, without retaining copies. Rudolph admitted that he did not return the documents he emailed himself, and that at least one of the documents, the strategic growth report, was confidential. (Nov. 19 Tr. at 124-25.) Although the parties will need to confer on which of the remaining documents were confidential, at least some documents, like those belonging to ingredientsPLUS's customer Cargill, are clearly marked confidential. (*See* ECF No. 17-8 at 4.) Rudolph's opposition ignores this provision of the Agreement and instead relies on his insistence that he did not use improper means to acquire confidential information. (Rudolph Opp. at 25-26.) But Rudolph was obligated under the terms of the Agreement not to keep *any* confidential information, even if properly obtained. (ECF No. 15-3 § 12(e).)

That said, ingredientsPLUS has not shown that Rudolph has disclosed or is likely to disclose confidential information to DWT, besides the Fleet List and the Driver Compensation Policy. ingredientsPLUS relied on the documents it knew Rudolph sent to himself, arguing that those documents could advantage DWT's business. But Wolfe credibly testified that he has not seen any of the confidential customer information Rudolph sent himself (Nov. 20 Tr. at 199), and Rudolph credibly testified that he did not send any other documents to Wolfe (Nov. 19 Tr. at

15

125-26). Indeed, the document ingredientsPLUS focused on—a Cargill wash station specification manual—is unlikely to have been used by DWT, which does not and has not tried to perform truck washing services for Cargill. (Nov. 20 Tr. at 167.) Wolfe also testified that his wash station is distinct from ingredientsPLUS's in several important ways, and that DWT's wash station has been modified for only one customer in the past year, who is not shared with ingredientsPLUS. (*Id.* at 163-66, 182.)

ingredientsPLUS urges this Court to rely on *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006), but this is not a case where Rudolph's "new position will inevitably require disclosure of [ingredientsPLUS's] trade secrets or confidential information." *Int'l Bus. Machines Corp. v. Visentin*, No. 11-CV-399, 2011 WL 672025, at *16 (S.D.N.Y. Feb. 16, 2011) (distinguishing *Estee Lauder*). Unlike in *Estee Lauder*, Rudolph's new position at DWT is hardly identical to his role at ingredientsPLUS, and in fact is almost entirely unrelated. Thus, even if DWT and ingredientsPLUS are "direct" competitors as to sweetener hauling, Rudolph is unlikely to use any confidential information in his possession in his new role. *Id.* at *17-20 (finding plaintiff failed to show that defendant's new job would make disclosure of trade secrets inevitable where the new and prior job were not nearly identical and the nature of defendant's new job would not require him to use plaintiff's confidential information). Further discovery may bear out ingredientsPLUS's contention that Rudolph forwarded those emails he sent to himself, but on this record, the contention is based solely on "speculative arguments about how business really works." *Pella Windows & Doors v. Buscarnera*, No. 07-CV-82, 2007 WL 2089298, at *2 (E.D.N.Y. July 18, 2007).[5]

---

[5] ingredientsPLUS also does not succeed under the "serious questions on the merits" alternative to likelihood of success, as it has not shown irreparable harm for the reasons discussed below.

Rudolph does concede, however, that he sent the Fleet List and the Driver Compensation Policy to Wolfe. The parties dispute whether these documents are confidential, with ingredientsPLUS offering testimony that both documents are confidential (Nov. 19 Tr. at 83-85; Nov. 20 Tr. at 141) and Defendants testifying that the information contained in those documents were previously shared with Wolfe or publicly posted (Nov. 20 Tr. at 142-43, 159). On the current record, the Court credits testimony from Pacheco and Kara Roth, ingredientsPLUS's director of human resources, that the documents are confidential, especially given the absence of documentary evidence supporting Defendants' testimony that the exact information contained in the Fleet List and the Driver Compensation Policy is otherwise publicly disclosed. Thus, at this juncture and as to these two documents, ingredientsPLUS has shown a likelihood of success that Rudolph disclosed confidential information to Wolfe.

### b.    Non-Compete

ingredientsPLUS fails to satisfy either merits standard as to its remaining contract claims. The non-compete provision of the Agreement requires that, until the first anniversary of the effective date of Rudolph's termination, Rudolph "shall not, directly or indirectly, . . . engage in or become associated with a Competitive Activity." (ECF No. 15-3 § 13(a).) The Agreement defines "Competitive Activity" to mean "being engaged in the Business" within 350 miles of ingredientsPLUS's Headquarters or any other jurisdiction in which the company does business immediately prior to the termination. (*Id.*) In turn, the Agreement defines "Business" to "mean[], individually and collectively, (A) the business of purchasing, processing, packaging or distributing sugar, sweeteners or related products, . . . (B) the business of trucking and hauling food and beverage-related products, and (C) each other business of [] any member of the Company Group." (*Id.*) The Agreement provides that Rudolph is "associated with a

17

Competitive Activity," and therefore is in violation of this provision, if he "becomes directly or indirectly involved as an . . . employee . . . with any individual, partnership, corporation or other organization that is engaged in a Competitive Activity." (*Id.*) In other words, the Agreement requires Rudolph to abstain, for a year following the effective date of his termination, from working in any role for any company that is engaged in the business of trucking and hauling food and beverage-related products.

There is no dispute as to the fact that DWT engages in the business of trucking and hauling products, including food and beverage-related products. (*See* ECF No. 32 ¶ 3.) And Defendants do not dispute that DWT is engaged in such activity within 350 miles of ingredientsPLUS's headquarters. Accordingly, even though DWT is an indirect competitor of ingredientsPLUS—in the sense that DWT does not itself manufacture liquid sweeteners—DWT nonetheless competes with ingredientsPLUS within the sector of local sweetener hauling. However narrow or attenuated that competition may be, it still satisfies the definition of "Competitive Activity" set out in the non-compete clause, and Rudolph is in technical breach of the provision by working for DWT within a year of his departure from ingredientsPLUS.

But the Court's analysis does not stop there. A district court must consider whether the restrictive covenant is likely to be enforceable under New York law as part of its analysis as to likelihood of success. *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 105 (2d Cir. 2024). Under New York law, a restrictive covenant in the employment context "will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999). "A violation of any prong renders the covenant invalid." *Id.*

ingredientsPLUS is unlikely to succeed on the merits of this breach of contract claim because the *BDO Seidman* inquiry counsels against enforcement in the circumstances here. First, ingredientsPLUS has identified only a weak legitimate interest in enforcing the non-compete. In *BDO Seidman*, the New York Court of Appeals noted that "cognizable employer interests" are limited "to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." *Id.* ingredientsPLUS has made no allegations as to whether Rudolph's services were unique or extraordinary. Thus, ingredientsPLUS would have to show that one of the other legitimate interests recognized by *BDO Seidman*—protection of trade secrets, protection of confidential customer information, or protection of its client base— justifies preliminary enforcement of the non-compete.

ingredientsPLUS fails to show that the non-compete as enforced against Rudolph would protect its legitimate interest in trade secrets. "[M]ere 'knowledge of the intricacies of a business operation' does not qualify" as a trade secret. *Silipos, Inc. v. Bickel*, No. 06-CV-02205, 2006 WL 2265055, at *3 (S.D.N.Y. Aug. 8, 2006) (quoting *Catalogue Serv. of Westchester, Inc. v. Henry*, 484 N.Y.S.2d 615, 616 (2d Dep't 1985)). Indeed, "New York courts have routinely held that business or financial information, such as market reports, do not trigger the trade-secrets legitimate interest." *Id.* at *4 (collecting cases). On the record provided here, Rudolph's knowledge gained from being Vice President of Operations and Quality and then Vice President of Capital Projects involves largely information of this sort. Indeed, Rudolph "is not an engineer, so his lack of technical knowledge" means that any information he has as to the trailer wash specifications is unlikely to qualify as a trade secret. *See id.* Moreover, the fact that Wolfe himself was not required to sign a non-compete, despite being privy to similar logistics

19

information while working for ingredientsPLUS and despite openly operating a competing business, cuts against finding a legitimate interest in protecting trade secrets. (Nov. 20 Tr. at 157-58.) *Int'l Bus. Machines Corp.*, 2011 WL 672025, at *10.

ingredientsPLUS has, however, sufficiently established a legitimate interest in protecting confidential client information and a client base. "The New York Court of Appeals has held that one legitimate interest of the employer is protection of customer relationships the employee acquired in the course of employment, because when the employee must work closely with the client or customer over a long period of time, then the employee has been enabled to share in the goodwill of a client or customer which the employer's over-all efforts and expenditures created." *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 103 (S.D.N.Y. 2021) (quotation marks omitted). "New York courts therefore reason that the employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *Id.* (cleaned up). ingredientsPLUS has marshaled evidence that Rudolph had a longstanding, if limited, relationship with clients, as he would be responsible for conducting quality checks or resolving quality issues. (Nov. 19 Tr. at 20, 22, 78.) Rudolph also had access to confidential customer information, such as individualized requirements for trailer wash systems, that is not known in the trade. (ECF No. 17-8). *Silipos*, 2006 WL 2265055, at *5.

Nonetheless, the remaining factors set out in *BDO Seidman* favor non-enforcement. A one-year limitation is typically reasonable. *See Estee Lauder Cos. Inc.*, 430 F. Supp. 2d at 181 ("[U]nder some circumstances covenants not to compete of one year or longer may be deemed reasonable."). However, as in *Silipos*, Rudolph's non-compete is overbroad because it "prohibits [him] from working for anyone 'directly or indirectly' engaged in the 'Business of the

Company.'" *Silipos*, 2006 WL 2265055, at *6. Indeed, Rudolph could not even work as a janitor for DWT without violating the terms of the non-compete provision. Where "there are areas of [defendant's] new position . . . that are unrelated to what he did for [plaintiff]," a non-compete enjoining that defendant from working that position is facially overbroad. *Int'l Bus. Machines Corp.*, 2011 WL 672025, at *21; *see also Silipos*, 2006 WL 2265055, at *6; *cf. PrecisionIR Inc. v. Clepper*, 693 F. Supp. 2d 286, 293-94 (S.D.N.Y. 2010) (enforcing non-competition obligation because "it merely bars [defendant] from working in roles similar to those he performed at [plaintiff]").

Moreover, given the relatively weak interest that ingredientsPLUS has established at this stage and the broad scope of the non-compete, enforcement would be unreasonably burdensome to Rudolph.[6] Rudolph's position at DWT is largely unrelated to the work he did at ingredientsPLUS—he has no oversight responsibility over manufacturing and critically has no client-facing or sales role. (Nov. 19 Tr. at 109-11; Nov. 20 Tr. at 156; Rudolph Decl. ¶ 41.) Additionally, ingredientsPLUS has not offered to pay Rudolph his salary for the duration of the "sitting out" period. *Estee Lauder Cos. Inc.*, 430 F. Supp. 2d at 182 (finding such compensation mitigated the hardship to defendant). Enforcement under such circumstances would be harmful both to Rudolph and to the general public, given New York courts' forceful reminder "that covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370 (2015) (cleaned up).

---

[6] The interest would be weak even if ingredientsPLUS had sufficiently demonstrated a trade secrets interest in its trailer wash system. Testimony at the hearing made clear that DWT's trailer wash system is fundamentally different from that of ingredientsPLUS, such that any interest ingredientsPLUS has is poorly served by enforcing the non-compete in this instance. (Nov. 20 Tr. at 163-66.)

21

ingredientsPLUS also fails to satisfy the "serious questions on the merits" alternative to likelihood of success, which requires showing "both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *RiseandShine Corp.*, 41 F.4th at 119 (quotation marks omitted).  For the reasons discussed above, ingredientsPLUS is minimally harmed by non-enforcement of the non-compete because its legitimate interest in enforcement is weak and because that interest is poorly served, given the many ways in which Rudolph's new role materially differs from his previous roles at ingredientsPLUS.  Under such circumstances, the balance of hardships does not decidedly favor ingredientsPLUS.

Because ingredientsPLUS is unlikely to succeed on the merits of its non-compete claim, the Court denies preliminary relief related to enforcement of the non-compete.

### c.    Non-Solicitation

Two provisions of the Agreement also prohibit Rudolph from, "directly or indirectly, solicit[ing], recruit[ing] or hir[ing] any employee" of ingredientsPLUS and from "encourag[ing] any business customer, partner, affiliate, supplier, or vendor of any member of the Company Group to cease doing business with any such member of the Company Group or to engage in any Competitive Activity on its own or with any Competitor of any member of the Company Group." (ECF No. 15-3 §§ 13(b), 13(c).)

ingredientsPLUS has failed to marshal evidence that Rudolph has solicited either ingredientsPLUS employees or customers to DWT.  Despite ingredientsPLUS's focus on Tiffany Anzalone, no evidence in the record supports the conclusion that Rudolph solicited her.  Instead, testimony elicited over the two-day hearing establishes that Anzalone herself decided to reach out to Wolfe about a possible job and likely did not even know that Rudolph was working at DWT until her interview.  (Nov. 19 Tr. at 113, 122-23; Nov. 20 Tr. at 183-84.)  Indeed,

Defendants submitted a copy of Anzalone's email to Wolfe seeking a position at DWT and an agreement between Anzalone and DWT stating that Anzalone was not solicited.  (ECF No. 32-1; ECF No. 32-2.)  ingredientsPLUS similarly failed to marshal evidence that any of its other former employees who left to work for DWT were solicited to do so by Rudolph.  (*See* Nov. 19 Tr. at 132-33.)  On this record, ingredientsPLUS has failed to show even a serious question as to Rudolph's breach of the employee non-solicitation provision.

The same holds true for the customer non-solicitation provision.  ingredientsPLUS offers no evidence that Rudolph has solicited or attempted to solicit other customers, and instead relies on the fact that it has recently lost business and that it believes it lost such business to DWT. ingredientsPLUS argues that it lost some Kerry business to DWT, and that Anzelone could have valuable Kerry information, but testimony elicited at the hearing indicates that the lost business actually went to Oakley.  (Nov. 20 Tr. at 151-52.)  As to the two other customers ingredientsPLUS has lost since or around the time of Rudolph's departure, Baldwin Richardson and Creative Food Ingredients, ingredientsPLUS has not offered any evidence that Rudolph played a role in soliciting those companies to DWT.  Instead, ingredientsPLUS points only to the fact that Baldwin Richardson left for Indiana Sugars, which contracts with DWT, that Creative Food Ingredients likely did the same, and that Rudolph's emails to himself regarding other customers like Cargill create suspicion.  (Nov. 19 Tr. at 29-31, 36-37.)  But credible testimony establishes that Rudolph played no role in bidding any contracts at DWT and has never discussed Cargill's trailer wash specifications.  (Nov. 19 Tr. at 118; Nov. 20 Tr. at 147, 170-74, 181-82.) Moreover, DWT itself recently lost significant Baldwin Richardson business because the company decided to partner with Indiana Sugars to pump sugar over instead of trucking it.  (Nov. 20 Tr. at 179.)  Thus, the evidence makes it just as likely, if not more likely, that

23

ingredientsPLUS lost the Baldwin Richardson contract because of reasons related to Indiana Sugars' manufacturing, rather than DWT's transportation.

Accordingly, because ingredientsPLUS is unlikely to succeed on the merits of its non-solicitation claims, the Court denies preliminary relief related to enforcement of those provisions.

### 2.    Misappropriation of Trade Secrets

The Defense of Trade Secrets Act ("DTSA") allows an owner of a trade secret that is misappropriated to bring a civil action.  18 U.S.C. § 1836(b)(1).  "The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law."  *ExpertConnect, L.L.C. v. Fowler*, No. 18-CV-4828, 2019 WL 3004161, at *7 (S.D.N.Y. July 10, 2019).

"To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (quotation marks omitted).  "The DTSA defines 'trade secret' to include 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' so long as: (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'"  *Id.* (quoting 18 U.S.C. § 1839(3).)  The term "misappropriation" means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who" improperly

24

acquired knowledge of the secret or knew or had reason to know that knowledge of the secret was improperly acquired.  18 U.S.C. § 1839(5).  "[I]mproper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *Id.* § 1839(6).  "The statute therefore contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."  *Better Holdco, Inc.*, 666 F. Supp. 3d at 389 (quotation marks omitted).

Substantially for the reasons discussed above, on this record, the Court concludes that the Fleet List and Driver Compensation Policy—which Rudolph admitted to disclosing—satisfy the definition of trade secret.  ingredientsPLUS elicited testimony that such documents contained valuable business information, that the company took reasonable measures to limit access to that information, and that the information derived independent economic value from not being readily ascertainable through proper means.  (*See* Nov. 20 Tr. at 140-41 (describing how the Driver Compensation Policy is precisely crafted to ensure drivers are exempt employees and is confidential); Nov. 19 Tr. at 84, 101-02 (denying that the Fleet List is provided annually to carriers and stating that information contained therein lays out the entirety of ingredientsPLUS's fleet assets).)  Moreover, Rudolph misappropriated those documents by sending them to Wolfe, in violation of the confidentiality agreement.  *ExpertConnect, L.L.C.*, 2019 WL 3004161, at *6 (noting that breach of a contractual agreement constitutes improper means).  Thus, ingredientsPLUS is likely to succeed in its misappropriation claims as to these two documents.

Setting aside those two documents, however, and even assuming that the remaining information alleged by ingredientsPLUS to be in Rudolph's possession qualifies as trade secrets, ingredientsPLUS has failed to demonstrate that Rudolph misappropriated or is likely to misappropriate such information.  For the reasons discussed in the Court's analysis of the

confidentiality provision contract claim, ingredientsPLUS has failed to show that Rudolph has or is likely to use or disclose any trade secrets in his possession. That leaves acquisition. Rudolph credibly testified that he sent himself those documents while employed at ingredientsPLUS for the purpose of working on ingredientsPLUS matters from home without bringing home his work-issued laptop. (Nov. 19 Tr. at 111-12.) Where one "was authorized to acquire this information as part of his job, . . . he did not acquire it by improper means." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 405 (S.D.N.Y. 2021). ingredientsPLUS argues that Rudolph nonetheless violated the terms of his employment contract and the Employee Handbook by sending himself the 700 emails, such that his acquisition was improper. (Reply at 18.)

The Agreement and the Employee Handbook are far less explicit than ingredientsPLUS argues them to be. The Agreement provides that Rudolph "shall perform [his] duties from the Company's office in Lakeville, New York and such other locations as reasonably determined by [Rudolph]." (ECF No. 15-3 § 3(c).) And although the Agreement contains a confidentiality provision, it is silent on whether an employee can send himself confidential information while employed with the company for the purposes of remote work. (*See generally id.*) The Agreement does bind Rudolph to the Employee Handbook, but that document also does not explicitly prohibit Rudolph's conduct. Instead, it prohibits only "[f]orwarding emails externally or to unintended/unnecessary people," such that "[e]mployees may not forward email to any other person or entity without the express permission of the sender." (ECF No. 15-4 at 5.) This prohibition is ambiguous as to whether Rudolph's conduct—sending *himself* emails, albeit to an external account—is prohibited. Moreover, the Employee Handbook does not specify that employees can work *only* on work-issued laptops. (*See generally id.*) As a result, the Court concludes on this record that, even if Rudolph's conduct was prohibited, Rudolph did not have

26

the requisite *knowledge* that his acquisition was through improper means given the ambiguity of the relevant documents. 18 U.S.C. § 1839(5) (defining misappropriation to include only "acquisition of a trade secret of another *by a person who knows or has reason to know* that the trade secret was acquired by improper means" (emphasis added)).

Absent clear indication that Rudolph was prohibited from sending himself ingredientsPLUS documents for the purpose of working from home, ingredientsPLUS fails to show that Rudolph likely misappropriated the emails he sent himself. But even if ingredientsPLUS prevailed on this merits question under the lower "serious questions" standard, it fails in showing irreparable harm for the reasons discussed below in Section III.B.

### 3.    Tortious Interference

ingredientsPLUS lastly asserts claims for tortious interference with contract and with business relationships against both Defendants. (Mem. at 27.) "Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).

ingredientsPLUS fails to demonstrate a likelihood of success or even a serious question as to its tortious interference claims. ingredientsPLUS alleges that it has non-disclosure agreements ("NDAs") with its customers, and that Rudolph and Wolfe disclosed information protected by those NDAs to divert business away from the company. (Compl. ¶¶ 155-63.) "First, Plaintiff has not plausibly alleged adequate details about a specific contract between itself and a third party, but merely has alleged that it has 'agreements' with its customers. This is insufficient." *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012). More importantly, this argument fails to show how Defendants intentionally procured a

27

*third party's* breach of its contract with ingredientsPLUS. *See Lama Holding Co.*, 88 N.Y.2d at 424 (noting "no allegation that [defendant] intentionally procured [third party's] breach of its contract with [plaintiff]"); *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F.Supp. 477, 481 (S.D.N.Y. 1997) ("[I]n order to establish a claim under the tort of interference with contractual relations, a third party must breach the contract after being induced to do so by the defendant.").

ingredientsPLUS similarly fails on its claim for tortious interference with business relations. "A plaintiff suing for tortious interference with business relationship must prove that: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Guzik v. Albright*, No. 16-CV-2257, 2018 WL 4386084, at *5 (S.D.N.Y. Sept. 14, 2018) (quotation marks omitted). ingredientsPLUS alleges that Defendants' solicitation of ingredientsPLUS employees and customers constituted tortious interference. (Compl. ¶¶ 144-54.) But as discussed above, ingredientsPLUS has failed to show a likelihood of success or serious question as to whether Rudolph solicited either ingredientsPLUS employees or customers in violation of his Agreement. Moreover, the record fails to show that DWT improperly solicited employees or customers. A competitor is allowed to solicit at-will employees from a competitor absent allegations "that a third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice." *Guzik*, 2018 WL 4386084, at *5 (quotation marks omitted). ingredientsPLUS has shown that several former employees now work for DWT, but there is no indication in the record that DWT used improper means or had malice in soliciting the termination of those employees'

agreements with ingredientsPLUS.  Likewise, a company's "conduct in inducing customers" from a competitor fails to satisfy the elements of tortious interference when such inducement "did not constitute a crime or an independent tort and was not aimed solely at harming the [plaintiff]." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 182 (2004).  Even if the record supported a finding that DWT solicited ingredientsPLUS customers, the record evinces no motivation for such solicitation except "normal economic self-interest." *Id.*

Accordingly, the Court denies preliminary relief as to ingredientsPLUS's tort claims.

### B.    Irreparable Harm

Because ingredientsPLUS has demonstrated a likelihood of success only as to Rudolph's obligations to return confidential information and his disclosure of the Fleet List and Driver Compensation Policy, the Court considers irreparable harm only as to confidentiality.

"To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted).  Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Id.* (quotation marks omitted).

"The accessing, disclosing, copying, or otherwise conveying of Plaintiff's [confidential and proprietary information] will result in immediate and irreparable injury[.]" *Mission Cap. Advisors LLC v. Romaka*, No. 16-CV-5878, 2016 WL 11517040, at *1 (S.D.N.Y. July 22, 2016).  Rudolph has conceded that he still can access documents he sent to himself, in violation of the Agreement.  Rudolph has also conceded that he sent the Fleet List and Driver Compensation Policy to Wolfe.  ingredientsPLUS is irreparably harmed if Rudolph can continue to improperly access confidential information, and if Rudolph and DWT use the information Rudolph

29

improperly disclosed to Wolfe.  Because Rudolph has already disclosed the Fleet List and Driver Compensation Policy to Wolfe, the risk of irreparable harm to ingredientsPLUS is mitigated only if DWT is also enjoined from using or disclosing those two documents.

However, ingredientsPLUS has not shown a risk of irreparable harm as to the use or disclosure of other documents within Rudolph's possession.  As articulated above, Rudolph's new position at DWT is largely unrelated to his duties at ingredientsPLUS, such that there is only a "remote possibility" that his new job would entail disclosure of confidential information. *Pella Windows & Doors*, 2007 WL 2089298, at *1 (noting such a remote possibility "did not present the type of significant risk of irreparable harm necessary for the drastic relief of a preliminary injunction").

### C.    Remaining Factors

The remaining factors—balance of the hardships and the public interest—also counsel in favor of limited preliminary relief as to Rudolph's access to and use of ingredientsPLUS's confidential information.  Defendants are minimally burdened by an injunction requiring Rudolph to return information he was contractually bound to return and prohibiting either Defendant from using or disclosing the Fleet List or Compensation Driver Policy.  In contrast, ingredientsPLUS has shown that it is likely to suffer irreparable harm in the absence of injunctive relief if Rudolph were to use and/or disclose its confidential information.  *Estee Lauder Cos. Inc.*, 430 F. Supp. 2d at 182.  And the public interest is served by holding Rudolph to the bargained-to Agreement.

### D.    Bond

ingredientsPLUS argues that a bond is not warranted because Rudolph's Agreement waives the bond requirement.  (ECF No. 15-3 § 19.).  "District courts have 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has

30

been no proof of likelihood of harm.'" *Heisman Trophy Tr. v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 329 (S.D.N.Y. 2009) (quoting *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996)).  Given the narrow relief ordered, as well as the absence of evidence that Defendants will be harmed absent a bond, the Court concludes that a bond is not necessary.

## IV.    Conclusion

For the foregoing reasons, ingredientsPLUS's motion for a preliminary injunction is GRANTED in part and DENIED in part as follows:

Pending decision in this case or further order of this Court, it is hereby ORDERED that:

1. For the remainder of the term set out in the Agreement, Rudolph and DWT are enjoined from using or disclosing, or engaging others to use or disclose, the Fleet List and the Driver Compensation Policy.

2. Rudolph is also ordered to confer with ingredientsPLUS to determine a method of returning, deleting, and/or sequestering all ingredientsPLUS documents Rudolph sent to his personal email while employed at the company and which contain any confidential information.

3. ingredientsPLUS's motion is DENIED in all other respects.

The initial pretrial conference initially scheduled for December 11, 2025 is rescheduled to January 29, 2026 at 11:00 a.m.  The conference will be telephonic.  Attendees should call (855) 244-8681 at the scheduled time. The attendee ID number is 2312 828 7066.

The Clerk of Court is directed to close the motion at Docket Number 15 and to amend the caption as set forth in the first footnote.

SO ORDERED.

Dated:  December 23, 2025
        New York, New York

_____
J. PAUL OETKEN
United States District Judge